UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NORMAN TRAVERSE AND NASSRINE TRAVERSE, INDIVIDUALLY AND ON BEHALF OF TECHNOLOGY PARK X LIMITED PARNTERSHIP,<br><br>Plaintiffs,<br><br>v.<br><br>THE GUTIERREZ COMPANY, GUTIERREZ CONSTRUCTION COMPANY, ARTURO J. GUTIERREZ, ARTHUR J. GUTIERREZ JR., and TECHNOLOGY PARK X LIMITED PARTNERSHIP,<br><br>Defendants. | No. 18-cv-10175-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                            October 30, 2018

### I. Introduction

Plaintiffs Norman Traverse ("Norman") and Nassrine Traverse ("Nassrine"), individually and derivatively on behalf of Technology Park X Limited Partnership (collectively, "the Traverses"), bring suit against The Gutierrez Company ("TGC"), Gutierrez Construction Company, Inc. ("GCCI"), Arturo J. Gutierrez ("Arturo"), Arthur J. Gutierrez, Jr. ("Arthur"), and Technology Park X Limited Partnership ("Tech Park X"). D. 1. Arthur J. Gutierrez, Jr., Arthur J. Gutierrez, Gutierrez Construction Co., and the Gutierrez Company ("the Gutierrez Defendants") move to dismiss certain counts of the complaint. D. 18. For the following reasons, the Court ALLOWS in part and DENIES in part the Gutierrez Defendants' motion.

1

## II. Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court must distinguish between "the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012). "The court then must determine whether the 'factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). Under Rule 9(b) of the Federal Rules of Civil Procedure, a party alleging "fraud or mistake" must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requires specifying "not only . . . the false statements and by whom they were made but also identifying the basis for inferring scienter." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009).

## III. Factual Background

The following summary is based upon the allegations in the amended complaint, D. 15, which are accepted as true for the consideration of the motion to dismiss. Tech Park X is a limited partnership, created by the Tech Park X Limited Partnership Agreement ("LP Agreement") in which the Traverses hold a 38 percent share, and TGC, Arturo, and Arthur, among others, all hold smaller stakes. D. 15 ¶ 12. Both TGC and GCCI are corporations owned by Arturo, who is the father of Arthur. D. 15 ¶ 9. Arthur is the President of TGC and of GCCI. D. 15 ¶ 10. Tech Park X was formed in the 1980s, with the principal asset of an office building with leasable space and the underlying land. D. 15 ¶¶ 17, 19. Over the years, other similar entities have been created with the "Tech Park" name. D. 15 ¶ 16. TGC is the "general partner" of Tech Park X and is responsible

for the management of Tech Park X.  D. 15 ¶ 22.  Under the LP Agreement that created Tech Park X, TGC is required to pay reasonable rates for services it purchases on behalf of Tech Park X, must ensure that contracts it makes on behalf of Tech Park X with entities that it is affiliated with are in the best interests of all parties, must distribute Tech Park X surplus cash flow annually to the partnership and may not loan any funds on behalf of Tech Park X.  D. 15 ¶¶ 22-25.

Tech Park X, through TGC, paid out distributions to the partnership in 2010, 2011, and 2012, some portion of which was subsequently clawed back pursuant to an agreement between the parties.  D. 15 ¶ 26.  In 2011, Tech Park X paid out $2 million in distributions, out of under $7 million cash receipts, at least some of which was later clawed back.  D. 15 ¶ 28.  Since 2012, Tech Park X has not paid any distributions.  D. 15 ¶ 26.  In 2015, Tech Park X's cash receipts were $1.4 million above its 2011 cash receipts and in 2016, Tech Park X's cash receipts reached nearly $10 million.  D. 15 ¶ 28.  Management fees paid by Tech Park X to TGC or a TGC affiliate increased to $400,000 in 2015 and $500,000 in 2016, almost double the amount charged in 2013 and above the maximum permitted in the LP Agreement.  D. 15 ¶ 29.  Building supervision fees paid to GCCI from 2013-2016 were allegedly twice the cost of the labor incurred.  D. 15 ¶ 29.  Other expenses that were allegedly unreasonably high included expenses for cleaning supplies, snow removal, and accounting and auditing.  D. 15 ¶¶ 30.  TGC allegedly overpaid GCCI to perform certain services, such as the construction of a cafeteria, the installation of drywall in the cafeteria, improvements to the fitness center, and demolition work.  D. 15 ¶¶ 37-41.  The Traverses allege that the TGC wrongfully used Tech Park X funds to pay expenses for other Tech Park partnerships in which TGC had a greater ownership share; that TGC improperly awarded unreasonably expensive contracts to itself or affiliated corporations; and that TGC did not bid out contracts to obtain competitive rates.  D. 15 ¶ 36.

The complaint specifically references an incident wherein a water main broke, due to improper installation of a component by GCCI, according to an engineer's report provided by TGC. D. 15 ¶ 46. TGC, rather than pursuing claims against GCCI, paid GCCI to supervise the work to fix the water main damage. D. 15 ¶ 46.

In a subsequent incident, TGC executed a promissory note in the amount of $2.3 million from Tech Park X to Arturo on December 31, 2014, ostensibly to document a loan from Arturo to Tech Park X. D. 15 ¶ 47. Tech Park X did not receive the funds of the purported loan, but rather Arturo paid the $2.3 million directly to TGC, and Tech Park X repaid Arturo in installments in 2015 and 2016. D. 15 ¶ 47.

Since 2014, TGC, acting on behalf of Tech Park X, sent various financial statements and ledgers to the Traverses. D. 15 ¶ 98. Around September 2015, the Traverses began requesting additional records and financial information regarding Tech Park X. D. 15 ¶ 50. The records the Traverses received indicated to them that Tech Park X engaged in allegedly irregular financial patterns, including keeping "due to" and "due from" accounts with affiliated entities including TGC, GCCI, and other vendors, without making actual payments. D. 15 ¶ 52. The records also purportedly showed that TGC, acting on behalf of Tech Park X, transferred sums between Tech Park X, other projects, and affiliated interest, "without any apparent justification." D. 15 ¶ 53. Included in those transactions was a transfer that appeared to reimburse TGC for expenses that it was not contractually eligible to be reimbursed for, relating to expenses maintaining the land related to both Tech Park X and another project. D. 15 ¶ 53. At one point, Tech Park X received a $200,000 wire transfer from BOP V, another office park entity purportedly controlled by the Gutierrez family. D. 53 ¶ 55. That wire transfer came with the entry "due from BOP V." D. 15 ¶ 55. At some point, that entry was transferred from the "due to BOP V" account to the "due to

4

TGC" account, without any apparent reason. D. 15 ¶ 55. Additionally, Tech Park X made payments to BOP I, an entity purportedly related to BOP V, similarly without explanation. D. 15 ¶ 55.

Nassrine sought additional information to sort through Tech Park X's complex records, but TGC purportedly obstructed and delayed responding to her request for information. D. 15 ¶ 58. She continued to seek and review documents through 2016 and 2017. D. 15 ¶ 59. On July 24, 2017, in a letter written by counsel, Nassrine wrote that TGC may have caused Tech Park X to pay unreasonably high compensation for certain services provided from 2011 forwards. D. 15 ¶ 61. The letter requested a tolling arrangement between the parties to provide an opportunity for the parties to resolve their disputes before commencing litigation. D. 15 ¶ 61. On August 10, 2017, counsel representing simultaneously Tech Park X and TGC responded to Nassrine's letter rejecting the request for a tolling agreement. D. 15 ¶ 62. Nassrine sent a follow up letter on September 8, 2017, outlining the potential claims against TGC and GCCI, and again proposed a tolling agreement. D. 15 ¶¶ 64, 65. On September 26, 2017, the same counsel representing both Tech Park X and TGC rejecting the request for a tolling agreement. D. 15 ¶ 66.

## IV. Procedural History

On December 29, 2017, the Traverses filed a complaint in Suffolk Superior Court. D. 1-1. The Defendants subsequently removed the action to federal court. D. 1. The Traverses filed an amended complaint on February 26, 2018. D. 15. In the amended complaint, the Traverses assert the following claims: Count I, breach of the LP Agreement, against TGC; Count II, breach of fiduciary duty, against TGC, Arthur and Arturo; Count III, aiding and abetting a breach of fiduciary duty, against GCCI, Arturo and Arthur; Count IV, fraud, against TGC, GCCI, and Arthur; Count V, aiding and abetting fraud, against Arturo, Arthur, and GCCI; Count VI, a Chapter

5

93A claim against Arturo, Arthur and GCCI; Count VII, a Chapter 93A claim against all Defendants; Count VIII, a demand for accounting against TGC related to Tech Park X's accounts; Count IX, a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants; and Count X, a claim for conspiracy to violate RICO against all Defendants. D. 15. The Gutierrez Defendants have now moved to dismiss certain counts on March 12, 2018. D. 18. On May 10, 2018, the Court heard argument on the motion and took the matter under advisement. D. 25.

**V. Discussion**

The Gutierrez Defendants move to dismiss certain counts in the complaint: Count II, the breach of fiduciary duty, but only with respect to Arturo and Arthur; Count III, aiding and abetting the breach of fiduciary duty; Count IV, fraud and misrepresentation; Count V, aiding and abetting fraud and misrepresentation; Count IX, the RICO claim; and Count X, the RICO conspiracy claim.

**A. Count IX and Count X: RICO and RICO Conspiracy Claims Against All Defendants**

To state a claim under RICO, a plaintiff must allege "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." Giuliano v. Fulton, 399 F.3d 381, 386 (1st Cir. 2005). "'Racketeering activity' means any act that violates one of the federal laws specified in the RICO statute . . . including the mail and wire fraud statutes." Id. To show a "pattern," a plaintiff must allege "two acts of racketeering activity," "within ten years of each other," that are "related" and "amount to or pose a threat of continued criminal activity." Id. There are two ways that a plaintiff may show that the criminal activity at issue satisfies the continuity requirement of such showing: the "closed-ended approach," which requires a plaintiff show "a series of related predicates extending over a substantial period of time" that amount to "a threat of continued criminal activity," and the "open-ended approach," which requires a plaintiff to show "a specific

6

threat of repetition extending indefinitely into the future" or as "part of an ongoing entity's regular way of doing business." Id.

The Gutierrez Defendants argue that the complaint does not state facts sufficient to show continuity under either the "closed-ended" or "open-ended" theories, because the alleged scheme was of insufficient duration and was designed with only one victim – the Traverses – in mind. D. 19 at 7-10.

The Traverses contend first that the complaint pleads facts sufficient to state a claim under the "closed-ended theory," because the purported scheme to transfer money out of Tech Park X and towards TGC-affiliated entities, extended from 2012 through 2016 and across multiple types of expenses and multiple TGC-affiliated entities. D. 22 at 7-10. The Traverses allege specific unlawful transfers that took place in each year from 2012 to 2016. D. 15 ¶¶ 29 (management fees in 2015 and 2016), 30 (cleaning supplies in 2015), 47 ($2.3 million promissory note in 2014); 131(a) (lobby renovation work in 2012 and 2013); 131(b) (Empirix renovation work in 2013); 131(d) (cafeteria renovation work in 2013 and 2014). The Traverses further argue that the transmission of the fraudulent financial statements, throughout that period and into 2017, across the mail and through the internet, constituted predicate acts that furthered the fraud. D. 22 at 10-13.

In assessing the duration of a putative RICO scheme, "the scheme's duration must be measured by reference to the particular defendant's fraudulent activity, rather than by otherwise innocuous or routine mailings that may continue for a long period of time thereafter." Feinstein v. Res. Trust Corp., 942 F.2d 34, 46 (1st Cir. 1991). The mailing of financial documents would only serve to extend the period if they "comprised a means by which the fraudulent scheme was perpetrated, or served to perpetuate or conceal the fraud." Id. Here, the Traverses adequately

7

allege that the financial statements served to "conceal the fraud," because the Traverses allege that the manner of accounting for the transfers between TGC-affiliated entities within the financial statements was done with the intention to conceal overpayments and unlawful transfers to TGC-affiliated entities. D. 15 ¶ 52-55. The amended complaint identifies dates that particular officers of TGC, acting at the direction of Arthur, sent specific financial documents to the Traverses. D. 15 ¶ 128. In particular, the amended complaint identifies the financial statements and cash ledgers for 2013, 2014, 2015, and 2016 as documents sent by wire to the Traverses by Tobin Dozois, acting at the direction of Arthur, from October 2014 to November 2017. D. 15 ¶ 128. It also identifies particular entries in those financial statements that served to conceal the underlying fraud. D. 15 ¶ 129. In particular, the amended complaint identifies a $140,160 amount in the 2014 general ledger that served to conceal an unlawful payment that was falsely recorded as being related to tenant improvements, D. 15 ¶ 129, among other unlawful payments documented in the financial statements in 2012 and 2013. D. 15 ¶ 131. Both the underlying purportedly fraudulent transfers and the transmission of the financial statements, therefore, constitute acts relevant to considering the duration of the scheme. The scheme, as pled by the Traverses, thus spanned nearly six years and included numerous predicate acts and entities.

Nevertheless, the scheme only involved a small number of victims – those co-owners of Tech Park X who do not have interests in the TGC-affiliated entities that were the recipients of the unlawful transfers. D. 15 ¶ 12. Also, while the amended complaint alleges a scheme that involves numerous entities, it only alleges one entity that was negatively affected: Tech Park X. The First Circuit, in reviewing a RICO claim regarding misconduct within a partnership, albeit over a twenty-one month time frame rather than a six-year time frame, reasoned that "[a]lthough a RICO pattern need not have countless victims, the finite nature of the racketeering activities alleged here,

together with their occurrence over a relatively modest period of time, cannot, in our view, support a jury finding of a RICO pattern under the 'closed' continuity approach." Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 19 (1st Cir. 2000). While it may be a close question, the Court concludes that the Traverses have not adequately pled a "closed-ended" theory of continuity under RICO. See Systems. Mgmt. Inc. v. Loiselle, 303 F.3d 100, 105-6 (1st Cir. 2002) (holding that a complaint did not state a claim under the closed-ended theory where the scheme related to the fraudulent maintenance of a single contract, even though that scheme included multiple fraudulent acts).

The Traverses, however, fare better under the "open-ended" theory of RICO. As the First Circuit explained in Efron, "[h]ad [the plaintiff] argued that the defendants planned to operate the hotel indefinitely at a paper loss as a means of perpetually defrauding him, rather than asserting the specific objective of squeezing him out of the Partnership, he would have a stronger argument for an open-ended RICO pattern." Efron, 223 F.3d at 20. That is what the Traverses allege here – that the Defendants are engaged in on ongoing conduct to squeeze funds out of Tech Park X, a purportedly profitable venture, indefinitely. The Traverses thus adequately allege "a specific threat of repetition extending indefinitely into the future" sufficient to state a claim under the open-ended theory. Giuliano, 399 F.3d at 387.

The Gutierrez Defendants also contend that the amended complaint does not adequately allege the RICO predicate of wire fraud because it does not allege that there was interstate activity. D. 19 at 6. The pleading, however, alleges that several of the fraudulent communications at issue took place via email. D. 15 ¶¶ 98, 128. In other contexts, the First Circuit has found that transmission over the internet constitutes interstate activity. See United States v. Lewis, 554 F.3d 208, 215 (1st Cir. 2009); see also Dewey v. Lauer, No. CIV.A08CV01734WYDKLM, 2009 WL

9

3234276, at *4 (D. Colo. Sept. 30, 2009) (finding use of email is sufficient to meet the interstate activity element of wire fraud). For all of these reasons, the Gutierrez Defendants' motion to dismiss Count IX and Count X is DENIED.

### B. Count II: Breach of Fiduciary Duty, Against TGC, Arturo and Arthur

The Gutierrez Defendants move to dismiss Count II with respect to Arturo and Arthur (but not with respect to TGC). D. 19 at 12-13. To state a claim for breach of fiduciary duty, the plaintiff must allege "(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages." Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. 835, 842 (2017). The Gutierrez Defendants contend that neither Arthur nor Arturo owed a fiduciary duty to the Traverses or Tech Park X. D. 19 at 13. The Traverses respond that Arthur and Arturo, as officers of TGC, are liable for Tech Park X's breach of fiduciary duty. D. 22 at 17 (citing Ray-Tek Services, Inc. v. Parker, 64 Mass. App. Ct. 165, 177-78 (2005) (holding that an officer of a corporation who was personally involved in the breach of fiduciary duty may be held personally liable for that breach)). The Gutierrez Defendants respond that the amended complaint does not adequately allege that either Arthur or Arturo "directly participated in the management of Tech Park X" because the LP Agreement only authorizes TGC to manage Tech Park X. D. 19 at 14-15. The amended complaint, however, alleges that Arthur is the President of TGC, that Arthur controlled TGC throughout the series of allegedly unlawful transactions at issue, that Arthur as President of TGC was the key decision maker at Tech Park X, that Arthur was involved in the repayment of the unlawful $2.3 million promissory note, that Arthur is involved in the management of BOP V, one of the affiliated firms that received transfers from TGC, and that Arthur directed others to provide false financial statements to the Traverses. D. 15 ¶¶ 10, 36, 47, 54, 68, 97, 98. The complaint also alleges that Arturo is the chairman of TGC and Arturo received the unlawful $2.3 million promissory note and

10

was thus directly involved in that transaction. D. 15 ¶ 9, 47. The complaint thus alleges specific actions that Arthur and Arturo took that made them personally involved in TGC's breach of fiduciary duty. The Gutierrez Defendants' motion to dismiss Count II is DENIED.

### C. Count III: Aiding and Abetting Breach of Fiduciary Duty, Against TGC, Arturo and Arthur

To state a claim for aiding and abetting a tort, the plaintiff must allege "(1) that [a party] committed the relevant tort; (2) that [the defendant] knew that [the first party] was committing the tort; and (3) that [the defendant] actively participated in or substantially assisted in his commission of the tort." Go-Best Assets Ltd. v. Citizens Bank of Massachusetts, 463 Mass. 50, 64 (2012). The Gutierrez Defendants argue that the amended complaint does not state a claim for aiding and abetting the breach of fiduciary duty, because they contend that the amended complaint does not allege that Arthur, Arturo, or TGC were aware of the breach of fiduciary duty or took specific acts to further that tort. D. 19 at 13. As explained above, however, it alleges the ways in which both Arthur and Arturo took specific acts to further the tort. The amended complaint also identifies numerous particular transactions that TGC took to further the breach of fiduciary duty at issue, including overpaying itself for management fees. D. 15 ¶ 29. The Gutierrez Defendants' motion to dismiss Count III is DENIED.

### D. Count IV: Fraud and Misappropriation, Against TGC, GCCI and Arthur

To state a claim for fraud, a plaintiff must allege "that the defendant has knowingly made a false statement of material fact, intending that the plaintiff rely thereon, and upon which the plaintiff did rely." Chan v. Chen, 70 Mass. App. Ct. 79, 82 (2007). Under Rule 9(b), a plaintiff alleging fraud must "specify the time, place, and content of an alleged false representation in his complaint." Tapogna v. Egan, 141 F.R.D. 370, 372 (D. Mass. 1992). The Gutierrez Defendants contend that the amended complaint does not allege that the Traverses detrimentally relied on any

11

false statements, because it does not identify the conduct that the Traverses would have taken but for the false statements. D. 19 at 11-12. The Traverses respond that they need not allege reliance. D, 22 at 13. In support of this contention, they cite first to Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 82 (D. Mass. 1998). In Sebago, the court held that there is no requirement of "actual, detrimental reliance" in RICO mail fraud cases. Id. at 81. Sebago, however, does not address the elements of a common-law fraud claim under Massachusetts law. Thus, while the complaint may adequately allege a claim for wire fraud as a RICO predicate notwithstanding its failure to allege detrimental reliance, the complaint does not state a claim for fraud under Massachusetts law. See Van De Velde v. Coopers & Lybrand, 899 F. Supp. 731, 738 (D. Mass. 1995) (noting that a "claim for fraud and deceit in Massachusetts should ordinarily be dismissed unless it pleads actual reliance"). The other cases cited by the Traverses, Demoulas v. Demoulas, 428 Mass. 555, 557 (1998) and Com. v. O'Brien, 305 Mass. 393, 395 (1940), do not address the reliance requirement. The Gutierrez Defendants' motion to dismiss Count IV is ALLOWED.

### E. Count V: Aiding and Abetting Fraud, Against Arturo, Arthur and GCCI

Because the Traverses have failed to state a claim for fraud, they similarly cannot state a claim for aiding and abetting fraud. See Go-Best Assets, 463 Mass. at 64 (explaining that stating a claim for aiding and abetting the commission of a tort requires stating a claim that some entity committed the underlying tort). The Gutierrez Defendants' motion to dismiss Count V is ALLOWED.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Gutierrez Defendants' motion to dismiss, D. 18, with respect to Count IV and Count V, the fraud claims, and DENIES it with respect to

Count II, Count III, Count IX, and Count X.  Count I, Count VI, Count VII and Count VIII also remain as they were unchallenged in this motion to dismiss.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge