UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
NORMAN TRAVERSE AND NASSRINE )
TRAVERSE, INDIVIDUALLY AND ON )
BEHALF OF TECHNOLOGY PARK X )
LIMITED PARNTERSHIP, )
)
Plaintiffs, )
)
v. )
) No. 18-cv-10175-DJC
)
THE GUTIERREZ COMPANY, GUTIERREZ )
CONSTRUCTION COMPANY, ARTURO J. )
GUTIERREZ, ARTHUR J. GUTIERREZ JR., )
and TECHNOLOGY PARK X LIMITED )
PARTNERSHIP, )
)
Defendants. )
)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                    **July 15, 2019**

**I.     Introduction**

Plaintiffs Norman Traverse and Nassrine Traverse, individually and derivatively on behalf of Technology Park X Limited Partnership (collectively, "the Traverses"), filed suit against The Gutierrez Company ("TGC"), Gutierrez Construction Company, Inc. ("GCCI"), Arturo J. Gutierrez, Arthur J. Gutierrez, Jr. and Technology Park X Limited Partnership (collectively, "Defendants"). D. 15. Defendants now bring a counterclaim against the Traverses alleging breach of contract (Count II), breach of fiduciary duty (Count III) and abuse of process (Count IV) and seek a declaratory judgment (Count I). D. 34. The Traverses have moved to dismiss the counterclaim pursuant to Fed. R. Civ. P. 12(b)(6). D. 38. Defendants have also moved to amend the answer and counterclaim. D. 56. The Court ALLOWS Defendants' motion to amend, D. 56,

and accordingly considers the proposed amended counterclaim filed at D. 57-1 to be the operative counterclaim.[1] For the following reasons, the Court ALLOWS in part and DENIES in part the Traverses' motion to dismiss Defendants' counterclaim, D. 38.

## II. Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). The Court will dismiss a pleading that fails to include "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "To avoid dismissal, a [counterclaim] must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" García-Catalán v. United States, 734 F.3d 100, 102 (quoting Fed. R. Civ. P. 8(a)(2)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "Nor does a [counterclaim] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (second alteration in original) (quoting Twombly, 550 U.S. at 557). "In determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" García-Catalán, 734 F.3d at 103 (second alteration in original) (citation omitted). "This context-specific inquiry does not demand 'a high degree of factual specificity.'" Id. (citation omitted).

---

[1] No further briefing is necessary even as the Court considers the motion to dismiss in light of the proposed amended counterclaim as the Traverses set forth their objections to the new claims in Defendants' amended counterclaim in their opposition to Defendants' motion to amend, D. 68, and Defendants briefed their disagreements in their reply, D. 78-1, all of which the Court has considered in addition to the filings regarding the motion to dismiss.

### III. Factual Background

The following summary is based upon the allegations in the amended counterclaim, D. 57-1 (which starts on page 20), which are accepted as true for the consideration of the motion to dismiss.

Plaintiff Norman Traverse ("Norman") entered into the Tech Park Associates Joint Venture Agreement in 1981 to develop property in Billerica, Massachusetts. D. 57-1 ¶ 13. In 2003, Norman assigned his interest in the venture to himself and Nassrine Traverse ("Nassrine") as joint tenants with rights of survivorship. D. 57-1 ¶ 20. The Traverses currently have a 38% ownership in the joint venture, as well as in two limited partnerships: Technology Park X Limited Partnership ("Tech Park X") and Technology Park V Limited Partnership ("Tech Park V"). D. 57-1 ¶¶ 21, 49. Tech Park X is a limited partnership that was created by the Tech Park X Limited Partnership Agreement (the "LP Agreement") in 1987 and amended most recently in 1997. D. 57-1 ¶¶ 22-23. Tech Park V is also a limited partnership created by agreement (the "Tech Park V LP Agreement") in 1999 and amended most recently in 2015. D. 57-1 ¶ 48. Tech Park X and Tech Park V both own commercial office buildings on the venture's land in Billerica that are managed by Defendant TGC. D. 57-1 ¶ 54. TGC is the general partner of Defendants Tech Park X and Tech Park V. D. 57-1 ¶ 5. Section 4.3 of the LP Agreement grants TGC "the exclusive right to manage the business of the Partnership." D. 57-1 ¶ 27. Defendant Arthur J. Gutierrez, Jr. ("Arthur") is the President of TGC and GCCI and a limited partner of Tech Park X and Tech Park V. D. 57-1 ¶ 8. Defendant Arturo J. Gutierrez ("Arturo") is a limited partner of Tech Park X and Tech Park V. D. 57-1 ¶ 7.

Tech Park X rents offices to commercial tenants in its building. D. 57-1 ¶¶ 39-40. TGC manages the building and receives 5% of the gross income generated by the building. D. 57-1

¶ 29. The LP Agreement specifies that parties to the Agreement may contract with Defendant GCCI, an affiliate of TGC, to provide construction and other services for Tech Park properties. D. 57-1 ¶ 30. The only condition on TGC's ability to retain the services of affiliated entities is that the provision of such services must "be at reasonable and competitive market rates." Id. (quoting LP Agreement § 4.6). Norman knew at the time of execution of the Joint Venture Agreement and LP Agreement that TGC wanted GCCI to provide most, if not all, construction services to the Tech Park properties. D. 57-1 ¶ 31.

From approximately 1989 through 2010, the Tech Park X building had consistent occupancy and low vacancy rates and Tech Park X made cash distributions to its partners. D. 57-1 ¶¶ 40-41. In 2010, however, one of the building's tenants filed for bankruptcy and another vacated the building. D. 57-1 ¶ 42. Since that time, there have been continued vacancies in the building and Tech Park X has operated at a deficit. D. 57-1 ¶ 44. Accordingly, Tech Park X has not made any cash distributions to its partners since 2012. Id. That same year, TGC decided to renovate the building to attract tenants and increase occupancy. D. 57-1 ¶ 45. Each year since the renovation, Tech Park X had been able to reduce vacancies, but suffered a blow in 2017 when another tenant filed for bankruptcy and ended its lease. D. 57-1 ¶ 46. Currently, only about 209,015 square feet of the building's total 449,000 square feet are occupied. D. 57-1 ¶ 47.

After the Tech Park partnerships ceased making cash distributions in 2012, the Traverses allegedly decided they wanted to leave the partnerships and embarked on a course of conduct meant to coerce TGC and other partners, including Arturo and Arthur, to acquire their interests. D. 57-1 ¶ 56. Under the LP Agreement, any limited partner needs consent of TGC to sell their partnership interest to anyone other than immediate family members. D. 57-1 ¶ 33.

In 2013, the Traverses began "bombarding" TGC with ongoing requests and demands for information about the partnerships' finances, including ongoing audits. D. 57-1 ¶ 58. In 2016, the Traverses hired a forensic accountant, and TGC gave the accountant access to Tech Park X and Tech Park V's records. D. 57-1 ¶ 62. The Traverses never shared the results of the forensic audit with TGC, Tech Park X, Tech Park V or any of the other limited partners. D. 57-1 ¶ 65.

The Traverses' information requests continued after the forensic audit and covered "nearly every expenditure made by Tech Park X, regardless of the nature and amount." D. 57-1 ¶ 68. For example, Nassrine allegedly sent a lengthy email to TGC seeking documentation for charges that included "such small cost items as caulk and tape." D. 57-1 ¶ 71. Some of the requests covered years' worth of expenditures, even though the Traverses already had access to audits for some of those years. D. 57-1 ¶ 72. In total, TGC employees spent over 100 hours responding to requests from Nassrine. D. 57-1 ¶ 73.

The LP Agreement contains several provisions governing the review of records. Section 9.1 provides:

> "the books and records of the Partnership shall be kept and maintained at the principal office of that Partnership and shall be available for examination by any Partner, or his duly authorized representatives, during regular business hours. . . The Partnership may maintain books and records and may provide such financial, or other, statements as the General Partner in their sole discretion deem[s] advisable."

D. 57-1 ¶¶ 35-36. Section 9.3 further provides that the "books of the Partnership shall be audited annually by such accounting [sic] or accounting firm as shall be selected by the General Partners." D. 57-1 ¶ 38. Similarly, the Tech Park V LP Agreement provides: "All books and records shall be maintained at the Partnership's principal office and each Partner, and his duly authorized

representative, shall have access to them and the right to inspect and copy them at all reasonable times." D. 39-1 § 11.2.[2]

The Traverses then employed litigation counsel, allegedly to make redundant requests for information in furtherance of their scheme to exit the partnerships. D. 57-1 ¶ 75. On July 24, 2017, the Traverses' attorney contacted TGC with allegations of overpayment by TGC for Tech Park X going back to 2011. D. 57-1 ¶ 76. The Traverses also threatened litigation and requested a tolling agreement. D. 57-1 ¶ 77. The Traverses' counsel contacted TGC again on August 16, 2017 to complain the TGC had not launched an investigation into the Traverses' allegations of overpayment, even though the Traverses had not provided evidence of an overpayment. D. 57-1 ¶¶ 78-79. TGC continued to respond to the information requests, sending detailed information about requested expenses, including, for example, ones related to a water main break at Tech Park X. D. 57-1 ¶ 83. "As a courtesy" to the Traverses, TGC provided the information via email, rather than requiring the Traverses to obtain the information in person. D. 57-1 ¶ 81. On September 8, 2017, the Traverses again wrote to TGC raising concerns about the lack of cash distributions for Tech Park X and a $2.3 million promissory note from Arturo to Tech Park X. D. 57-1 ¶ 85. The Traverses also made more allegations of overbilling, stated that a software program for general contractors revealed that TGC had overpaid for certain construction services from GCCI and repeated their request for a tolling agreement. D. 57-1 ¶ 86. On September 26, 2017, TGC provided a detailed response to the Traverses' most recent letter, including all supporting

---

[2] Although the Tech Park V LP Agreement was not attached to the complaint, on a motion to dismiss, the Court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint." Trans-Spec Truck Serv. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008) (quoting Shaw v. Dig. Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).

documentation requested. D. 57-1 ¶ 90. TGC continued to provide information to the Traverses through December 2017, when the Traverses filed the instant lawsuit. D. 57-1 ¶¶ 105-106.

Defendants allege that the Traverses' lawsuit raises allegations of misconduct that are contradicted by documents provided to the Traverses by TGC over the span of several years. D. 57-1 ¶ 108. For example, the Traverses allege in their complaint that Tech Park X never received any of the funds from the $2.3 million loan from Arturo, but Defendants allege that the Traverses possess extensive documents showing that the loan was bona fide and explaining how the proceeds were used. D. 57-1 ¶¶ 109-110. Similarly, the Traverses' complaint alleges that the water main break at Tech Park X was the fault of GCCI, even though TGC's September 26, 2017 letter explained the circumstances of the break and provided documents about the circumstances and the costs of repairs. D. 57-1 ¶ 113. Defendants allege that the purpose of the Traverses' lawsuit was not to enforce legitimate contractual rights, but rather to "achieve the Traverses' ulterior goal of coercing contractual and financial concessions and forcing a sale of their Tech Park interests." D. 57-1 ¶ 108.

## IV. Procedural History

On December 29, 2017, the Traverses filed a complaint in Suffolk Superior Court. D. 1-1. The Defendants subsequently removed the action to this Court. D. 1. The Traverses filed an amended complaint on February 26, 2018. D. 15. The Court allowed in part and denied in part Defendants' motion to dismiss the amended complaint. D. 26. Defendants filed an amended counterclaim, D. 57-1, and the Traverses have now moved to dismiss the counterclaim on all counts, D. 38. Defendants subsequently moved to amend their answer and counterclaim. D. 56. The Court heard argument on the motions and took the matters under advisement. D. 80.

V.     Discussion

A.     **Breach of Contract (Counterclaim Count II)**

To prove a breach of contract claim under Massachusetts law, Defendants must show there was an enforceable contract, the Traverses breached that contract and Defendants sustained injury as a result of the breach. Linton v. N.Y. Life Ins. & Annuity Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005) (citation omitted). Defendants allege that the Traverses breached section 4.3 of the LP Agreement by interfering with and trying to usurp TGC's exclusive authority to manage the business of Tech Park X. D. 57-1 ¶ 134. Defendants also allege that the Traverses breached section 9.1 of the LP Agreement by seeking information and documents from Tech Park X in conflict with the records provision. D. 51-7 ¶ 135. Defendants allege that the Traverses breached the Tech Park V LP Agreement in the same ways. D. 51-7 ¶¶ 136-137. Although Defendants did not identify a specific section of the Tech Park V LP Agreement, the Court understands them to be referring to the management provision of that Agreement, which provides that "[t]he General Partner shall have the exclusive management control of the business of the Partnership," D. 39-1 § 6.1(B), and that "[n]o limited partner . . . shall (i) participate in or have any control over the Partnership's business; (ii) transact any business for the Partnership; nor (iii) have the power to sign for and bind the Partnership," Id. § 6.2(A); see D. 39 n.4. Defendants allege that these contractual breaches damaged TGC by causing it to incur costs and expenses, including lost employee time. D. 51-7 ¶ 138.

The Court concludes that the Traverses' behavior, even as alleged, does not constitute a breach of contract. Under the LP Agreement and Tech Park V LP Agreement, the Traverses have a right to inspect company records. See D. 57-1 ¶¶ 35, 51. The Tech Park V LP Agreement also grants limited partners the option to have an annual audit conducted. See D. 57-1 ¶ 53. The

Agreements do not limit the number or frequency of requests that limited partners can make, and there is no express contractual language in either Agreement indicating that a burdensome or even a bad faith request would constitute a breach. Although there are some limits to a limited partner's right to inspect books and records under common law, see Gavin v. Purdy, 335 Mass. 236, 238-39 (1957), Defendants have not pointed to any authority suggesting that requesting documents outside the scope of what is allowed by contract constitutes a breach of that contract. Furthermore, the reasonableness of the request is properly construed as a defense to the Traverses' claims in the underlying complaint, rather than an independent cause of action. See D. 34 at 18-19 (asserting, in Defendants' answer, an affirmative defense that the Traverses' claims are barred by the terms of the Tech Park X LP Agreement). Finally, as to the allegations about usurpation of TGC's control, a limited partner in Massachusetts is deemed not to "participate in the control of the business" for purposes of liability solely by "exercising any right or power permitted to limited partners [under statute]" Mass. Gen. L. 109, § 19(b), (b)(8). Those rights include, in relevant part, "taking any action required or permitted by law to bring or pursue a derivative action in the right of the limited partnership." Id. § 19(b)(4).

Having concluded Defendants have failed to state a plausible claim for breach of contract, the Court considers Defendants' argument that, as an alternative to the breach of contract claim, the Traverses breached the implied covenant of good faith and fair dealing under both the LP Agreement and the Tech Park V LP Agreement. D. 57-1 ¶¶ 134-135. "Under Massachusetts law, '[e]very contract implies good faith and fair dealing between the parties to it.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013) (alteration in original) (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-70 (2010)). The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the

right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991) (quoting Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976)). The covenant, however, "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Laudano v. 214 S. St. Corp., 608 F. Supp. 2d 185, 195 (D. Mass. 2009) (quoting Liss v. Studeny, 450 Mass. 473, 477 (2008)). In other words, "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005).

As explained above, there are no contractual provisions preventing the Traverses from making these requests, even as Defendants allege that they were burdensome or even harassing. Defendants also were not under any contractual obligation to respond to any requests outside the scope of the contract and admit that they did so to "allay[] the Traverses' stated concerns" and "as a courtesy." D. 57-1 ¶¶ 81, 83. Finally, Defendants have not alleged that the Traverses' requests interfered with TGC's ability to carry out its contractual duties as general partner. The Court, therefore, concludes that the Defendants have not plausibly stated a breach the covenant of good faith and fair dealing claim and allows the Traverses' motion to dismiss Count II of the counterclaim.

### B. Breach of Fiduciary Duty (Counterclaim Count III)

Defendants argue that the Traverses assumed a fiduciary duty to Defendants by supervising an audit of Tech Park X's records, which is a role reserved for Tech Park X's general partner, TGC. D. 57-1 ¶ 141. According to Defendants, the Traverses' failure to disclose information they gained as a result of the audit constitutes a breach of their fiduciary duty. D. 57-1 ¶ 144. Under Massachusetts law, the elements of a breach of fiduciary duty are 1) existence of a fiduciary duty arising from a relationship between the parties; 2) breach of that duty; 3) damages; and 4) a causal

10

relationship between the breach and the damages. Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 164 (1999).

The Court concludes Defendants have failed to state a plausible claim that the Traverses owed a fiduciary duty to Defendants. Under the relevant Massachusetts law, a limited partner is not liable for the obligations of a limited partnership "unless . . . he participates in the control of the business." Mass. Gen. L. c. 109, § 19(a). As explained above, a limited partner does not "participate in the control of the business" within the meaning of the statute when he "exercis[es] any right or power permitted to limited partners." Id. § 19(b), (b)(8). Rather, a limited partner must effectively stand in the shoes of the general partner to create a fiduciary duty.

Where a fiduciary duty is not created by law, as is the case for limited partners, "the existence of the relationship ordinarily is a mixed question of law and fact for which the party asserting the relationship bears the burden." Doe v. Harbor Sch., Inc., 446 Mass. 245, 252 (2006). The "circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case." Id. (quoting Warsofsky v. Sherman, 326 Mass. 290, 292 (1950)). Defendants have not alleged a plausible claim, however, that Defendants "repose[d] 'faith, confidence, and trust in [the Traverses'] judgment and advice'" or that the Traverses were "in a formal position of authority over [Defendants]." Id. at 253 (citation omitted); see Warsofsky, 326 Mass. at 292 (listing examples of fiduciary relationships). In fact, all of the information the Traverses obtained about the partnerships came directly from Defendants. Because Defendants have failed to allege a plausible fiduciary duty, there can be no breach of same, and the Court allows the Traverses' motion to dismiss Count III of the Counterclaim.

### C. Abuse of Process (Counterclaim Count IV)

Defendants allege that the Traverses had an ulterior motive for their lawsuit and that its purpose was "not to vindicate legitimate legal rights [but] rather to obtain collateral advantages." D. 57-1 ¶ 152. To state a claim for abuse of process, Defendants must show that (1) process was used (2) the use was motivated by an ulterior purpose and (3) they suffered damages. See MHA Fin. Corp. v. Varenko Invs. Ltd., 583 F. Supp. 2d 173, 178 (D. Mass. 2008) (citing Jones v. Brockton Pub. Mkts., Inc., 369 Mass. 387, 389 (1975)). Process means "causing papers to issue by a court 'to bring a party or property within its jurisdiction.'" Silvia v. Building Inspector of W. Bridgewater, 35 Mass. App. Ct. 451, 453 n.4 (1993) (quoting Jones, 369 Mass. at 390). Abuse of process involves the "malicious use of legal process to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 142 (D. Mass. 2007) (quoting Carroll v. Gillespie, 14 Mass. App. Ct. 12, 26 (1982)). Claims for abuse of process are "not to be favored and ought not to be encouraged." Cohen v. Hurley, 20 Mass. App. Ct. 439, 443 (1985) (citation omitted).

The Traverses initiated this lawsuit, see D. 1-1, thereby satisfying process. Defendants have alleged that, in bringing this lawsuit, the Traverses aimed to further a purpose other than winning the lawsuit. See D. 57-1 ¶ 151 (alleging that the Traverses amended complaint was part of a "long-term scheme" to coerce contractual concessions from Defendants and to force Defendants to purchase the Traverses' interests in the limited partnerships at an "unreasonable premium"); D. 57-1 ¶¶ 156-157 (alleging that the Traverses' claims are meant to achieve goals outside this litigation); see Scholz v. Goudreau, No. 13-cv-10951-DJC, 2013 WL 6909433, at *7 (D. Mass. Dec. 26, 2013) (denying motion to dismiss abuse of process claim where nonmoving

party allegedly instituted three baseless lawsuits to drive a competitor out of business). Defendants have also pleaded damages arising out of the Traverses' alleged scheme. D. 57-1 ¶ 158. The Court, therefore, denies the Traverses' motion to dismiss Count IV.

### D. Declaratory Judgment (Counterclaim Count I)

Because the Court has concluded Defendants have failed to state a plausible claim for breach of contract, breach of the implied covenant of good faith and fair dealing or breach of fiduciary duty, the Court allows the Traverses' motion to dismiss Defendants' request for a declaratory judgment with respect to those claims but denies it with respect to the claim for abuse of process.

## VI. Conclusion

For the foregoing reasons, the Traverses' motion to dismiss Defendants' counterclaim, D. 38, is ALLOWED IN PART and DENIED IN PART. Accordingly, the Defendants' amended answer and counterclaim, D. 57-1, stands only to the extent that the counterclaim that remains is for abuse of process (Count IV) and declaratory judgment only as related to the abuse of process claim (Count I).

**So Ordered.**

/s/ Denise J. Casper
United States District Judge