**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **NORMAN TRAVERSE AND NASSRINE TRAVERSE, individually and on behalf of TECHNOLOGY PARK X LIMITED PARNTERSHIP,**<br><br>    **Plaintiffs,**<br><br> **v.**<br><br>**THE GUTIERREZ COMPANY, GUTIERREZ CONSTRUCTION COMPANY, ARTURO J. GUTIERREZ, ARTHUR J. GUTIERREZ JR., and TECHNOLOGY PARK X LIMITED PARTNERSHIP,**<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **No. 18-cv-10175-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    **August 6, 2021**

## I.    Introduction

Plaintiffs Norman Traverse and Nassrine Traverse, individually and on behalf of Technology Park X Limited Partnership (collectively, "the Traverses" or "Plaintiffs"), filed suit against The Gutierrez Company ("TGC"), Gutierrez Construction Company, Inc. ("GCCI"), Arturo J. Gutierrez, Arthur J. Gutierrez, Jr. and Technology Park X Limited Partnership (collectively, "Defendants"). D. 15. The Traverses have now moved for summary judgment on Defendants' remaining counterclaims for abuse of process (Counterclaim IV) and declaratory judgment regarding same (Counterclaim I). D. 380 (D. 403. The Traverses also move for summary judgment on their claims against Defendants for breach of contract (Count I), breach of fiduciary duty (Count II) and aiding and abetting breach of fiduciary duty (Count III). Id.

1

Defendants move for summary judgment as to all of the remaining claims against them.  D. 386.

For the following reasons, the Court DENIES in part and ALLOWS in part the Traverses' motion

for summary judgment, D. 380 (D. 403 in its unredacted form), and ALLOWS Defendants' motion

for summary judgment, D. 386.

## II.    Standard of Review

A court grants summary judgment where there is no genuine dispute as to any material fact

and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  "An issue is genuine if 'it may reasonably be resolved in favor of either

party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation

under the applicable law.'"  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration

in original) (quoting Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997)).  The movant "bears

the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co.

of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir.

2000)).  If the movant meets its burden, the nonmovant "must, with respect to each issue on which

she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve

that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).

"As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id.

(alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

The Court views the record "in the light most favorable to the non-moving part[y]" and

draws all reasonable inferences in the nonmovant's favor.  Pineda v. Toomey, 533 F.3d 50, 53 (1st

Cir. 2008).  The nonmovant, however, "may not rely on conclusory allegations, improbable

inferences, or unsupported speculation" to defeat a motion for summary judgment, "but must,

instead, 'set forth specific facts showing that there is a genuine issue for trial.'"  Id.  (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The nonmovant must offer "definite,

competent evidence to defeat a properly supported motion for summary judgment." <u>Burns v. State Police Ass'n of Mass.</u>, 230 F.3d 8, 9 (1st Cir. 2000)

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Adria Int'l Grp., Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir.2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." <u>Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc.</u>, 761 F. Supp. 194, 197-98 (D. Mass. 1991).

## III.    Factual Background

Unless otherwise indicated, the following are undisputed facts drawn from the Traverses' Statement of Material Facts, D. 405, the Defendants' Statement of Material Facts, D. 423, the Traverses' Response and Counterstatement to Defendants' Statement of Material Facts, D. 517, Defendants' Response and Counterstatement to the Traverses' Statement of Material Facts, D. 526, and Defendants' Response to the Traverses' Counterstatement, D. 565.

### A.    <u>Parties Enter into the JVA and the LP Agreement</u>

In 1981, Plaintiff Norman Traverse ("Norman") and TGC executed the Tech Park Associates Joint Venture Agreement ("JVA") to develop property in Billerica, Massachusetts (the "Property"). D. 423 ¶¶ 6-7; D. 517 ¶¶ 6-7  D. 405 ¶ 1. Pursuant to the JVA, Norman and TGC agreed to take steps to develop office and research development buildings in Billerica. D. 388-1 at 6-7. The JVA provided that TGC would "assume complete responsibility in the coordination, design, marketing and construction of the improvements to be located at the premises." <u>Id.</u> at 7. In 1987, prior to the execution of a lease to build a 449,055 square foot office building on the

property (the "Tech Park X Building"), Norman and TGC formed the Technology Park X Limited Partnership ("Tech Park X"), which was created by the Tech Park X Limited Partnership Agreement (the "LP Agreement").  D. 423 ¶ 18; D. 517 ¶ 18; D. 405 ¶ 1.  Tech Park X's principal asset remains the Tech Park X Building, located at 600 Technology Park Drive, Billerica, Massachusetts.  D. 423 ¶ 17; D. 517 ¶ 17; D. 405 ¶ 1.  In 2003, pursuant to the assignment of JVA, Norman affirmed, and Plaintiff Nassrine Traverse ("Nassrine" or "Mrs. Traverse") agreed, that they would be "subject to and bound by the [JVA] just as if they were signatories thereto."  D. 423 ¶¶ 14-15; D. 517 ¶¶ 14-15.  Pursuant to this assignment, Norman assigned his interest in the joint venture to himself and Nassrine as joint tenants with rights of survivorship.  D. 423 ¶¶ 14, 19; D. 517 ¶¶ 14, 19.

The Traverses hold a 38 percent limited partnership interest in Tech Park X and are jointly Tech Park X's Class A Limited Partner.  D. 423 ¶ 19; D. 517 ¶ 1; D. 405 ¶ 3.  TGC is a real estate development company and is Tech Park X's general partner.  D. 423 ¶ 1; D. 517 ¶ 1; D. 405 ¶ 10. Section 4.3 of the LP Agreement grants TGC "the exclusive right to manage the business of the Partnership."  D. 390-1 at 11.  Defendant Arturo J. Gutierrez ("Arturo") served as President of TGC and GCCI until 2006, after which Defendant Arthur Gutierrez, Jr. ("Arthur") served as President of both companies.  D. 423 ¶ 5; D. 517 ¶ 5; D. 405 ¶ 6.  GCCI, founded by Arturo, provides construction management services to various TGC properties, including the Tech Park X Building.  D. 423 ¶ 2; D. 517 ¶ 2; D. 405 ¶ 2.  Arturo continued to serve as Chairman of TGC and GCCI until 2015.  D. 423 ¶ 3; D. 517 ¶ 3; D. 405 ¶ 3.  In 2015, Arturo sold his ownership interests in TGC and GCCI to his children, including Arthur.  D. 423 ¶ 4; 517 ¶ 4.  The interest held by members of the Gutierrez family comprise approximately 43 percent interest in Tech Park X with

former TGC employees and former employees' family members holding approximately 19 percent interest and the Traverses holding approximately 38 percent interest.  D. 423 ¶ 20; 517 ¶ 20.

Pursuant to the JVA, TGC manages the Tech Park X Building, and the Gutierrez Company receives a fee "equal to five percent (5%) of the gross income [or three percent of gross income for a triple-net lease transaction] of the building(s) calculated and paid on a monthly basis, including in the computation of gross income, without limitation, operating/maintenance payments and real estate tax payments" for management services.  D. 388-1 at 18-10.  The LP Agreement specifies that "[t]he Partnership shall enter into a fixed price contract excluding change orders with the Contractor [defined as GCCI] for the construction of the [Tech Park X] Building and related improvements on the Property."  D. 390-1 at 19.  GCCI is TGC's wholly owned subsidiary, D. 565 ¶ 206, and is paid a fee of 5 percent of the construction costs for work that takes place at the Tech Park X Building.  D. 390-1 at 19-20.  The LP Agreement permits TGC to enter agreements on behalf of Tech Park X and TGC (the "Partnership") and retain the services of affiliated or third-party entities.  D. 423 ¶ 25; 517 ¶ 25.  The LP Agreement provides that any amounts paid by the Partnership in connection with such agreements, "shall be at reasonable and competitive market rates."  D. 390-1 at 12.  One of the motivating factors for TGC to enter the JVA was for GCCI to provide all project management and construction services for any construction projects that took place at the Tech Park X Building.  D. 423 ¶ 9; D. 517 ¶ 9.

### B.     Build-Out of the Tech Park X Building for Multiple Tenants

From the opening of the Tech Park X Building in 1989 until 2010, the building had one tenant, Nortel.  D. 423 ¶ 31; 517 ¶ 31.  In or about 2010, Nortel filed for bankruptcy.  D. 423 ¶ 32; D. 517 ¶ 32; D. 405 ¶ 14.  Given the Tech Park X Building's need to attract new tenants, TGC decided to convert the Tech Park X Building into a multi-tenant building and invest in base

building improvements, such as a new fitness center and upgraded cafeteria.  D. 423 ¶ 33; D. 517 ¶ 33; D. 405 ¶¶ 16-17.  These base building improvements were completed in phases between 2012 and 2016 by mostly, if not entirely, subcontractors.  D. 423 ¶¶ 35, 36; D. 517 ¶¶ 35, 36. GCCI charged Tech Park X a 5 percent fee based on the actual costs paid to the third-party subcontractors on the base building improvements.  D. 423 ¶ 37; 517 ¶ 37.  GCCI and Tech Park X did not have a written contract for the base building improvement projects.  D. 423 ¶ 44; D. 517 ¶ 44.  Labor costs, the reasonability of the fees charged and the extent of GCCI's search for and solicitation of market rate subcontractors for these improvements is at the core of the dispute between the parties, D. 517 ¶¶ 38-42, and the Court will address same in the context of the particular claims below.

Similar to the base building improvements, GCCI largely acted as a general contractor for the tenant improvement projects on the Tech Park X building.  D. 423 ¶ 69; D. 517 ¶ 69; D. 405 ¶ 30.  Tenant improvement projects are negotiated as part of leasehold negotiations and typically involve the tenant providing a tenant improvement allowance with a fixed number, i.e., $30/sq. ft., or delineating a plan and specifications for the construction build-out.  D. 423 ¶ 58; 517 ¶ 58. Under a stipulated sum or "turnkey" contract, the owner and contractor reach a fixed price for the construction work, which is agreed upon before construction is performed, to cover the scope of work required by the contract.  D. 423 ¶ 59; D. 517 ¶ 59; D. 405 ¶ 32.  Tech Park X's leases for several tenants contained a turnkey structure for tenant improvements.  D. 423 ¶ 64; D. 517 ¶ 64; D. 405 ¶ 31.

### C.    Distributions to Tech Park X's Limited Partners

From Tech Park X's inception till 2010, when Nortel filed bankruptcy, Tech Park X made substantial cash distributions to Tech Park X's limited partners.  D. 423 ¶ 154; D. 517 ¶ 154; D.

405 ¶ 19.  After Nortel filed for bankruptcy and its lease was set to expire in 2012, TGC sought to

end cash distributions to ensure there would be sufficient money available if Tech Park X's

remaining tenant did not renew its lease.  D. 423 ¶ 155; 517 ¶ 155.  The Traverses requested

distributions continue in 2010 but agreed that they would refund any distributions they received

between 2010 and 2012, in the event Nortel did not renew and Tech Park X did not have sufficient

cash.  Id.  In 2012, Nortel did not renew its lease.  D. 423  ¶ 156; 517 ¶ 156.  Another tenant,

Avaya, took over a portion of the Tech Park X Building, but only for 137,071 square feet of the

space Nortel had previously occupied, leaving a 311,984 square foot vacancy in the Tech Park X

Building.  D. 423 ¶ 32; 517 ¶ 32.  As a result, TGC clawed back distributions to Tech Park X's

limited partners, including the Traverses, and the Traverses refunded the distributions they had

agreed to refund.  D. 423 ¶ 156; D. 517 ¶ 156; D. 405 ¶ 19.  Traverses dispute that, from 2012 to

2017, Tech Park X did not have sufficient cash, as TGC claims, to make distributions to the Tech

Park X limited partners.  D. 423 ¶ 157; D. 517 ¶ 157; D. 405 ¶ 88.  In 2017, Avaya filed for

bankruptcy and did not renew its lease with Tech Park X.  D. 423 ¶ 158; D. 517 ¶ 158.  As of 2017,

the Tech Park X Building had an occupancy rate of approximately 46 percent, with only 206,450

square feet of the building's 449,055 square feet occupied by tenants.  D. 423 ¶ 56; 517 ¶ 56.  The

parties dispute whether the total net cash generated in 2017 was sufficient for distributions.  D.

423 ¶ 158; D. 517 ¶ 158.

     **D.**     **Examining Tech Park X's Financial Records**

     Under Article IX of the LP Agreement, as a limited partner, the Traverses are granted the

right to examine the Tech Park X's books and records.  D. 423 ¶ 146; 517 ¶ 146; D. 390-1 at 23-

24.  The Traverses utilized their inspection right, at minimum, in 2015, 2016 and 2017.  D. 423 ¶

147; D. 517 ¶ 147; D. 405 ¶ 92.  In 2016, Nassrine requested that TGC provide Tech Park X's

books and records for years 2011 to 2015.  D. 423 ¶ 148; D. 517 ¶ 148.  Over the course of a week,

TGC provided Nassrine's accountant and his colleagues with 24-hour access to the building for

their review.  Id.  It is undisputed that the documents TGC furnished to the Traverses accurately

reflected the Tech Park X's financial affairs, including actual payment records concerning limited

partnership expenses, including payments made to third-party vendors.  D. 423 ¶ 152; 517 ¶ 152.

## IV.    Procedural History

On December 29, 2017, the Traverses filed a complaint against Defendants in Suffolk

Superior Court.  D. 1-1.  The Defendants subsequently removed the action to this Court.  D. 1.

The Traverses filed an amended complaint on February 26, 2018.  D. 15.  The Court allowed

Defendants' motion to dismiss as to Counts IV (fraud) and V (aiding and abetting fraud) of the

amended complaint, but otherwise denied the motion.  D. 26.  The Traverses subsequently moved

to dismiss Defendants' counterclaims, D. 38, which the Court subsequently allowed as to all of the

counterclaims, except the counterclaim for abuse of process (Counterclaim IV) and the

counterclaim for declaratory judgment to the extent that it related to abuse of process

(Counterclaim I).  D. 131.  The Traverses have now moved for summary judgment on those two

remaining counterclaims and liability on Counts I (breach of contract), II (breach of fiduciary duty)

and III (aiding and abetting breach of fiduciary duty), three of their claims against Defendants.  D.

380.  Defendants have filed a cross motion for summary judgment, seeking summary judgment in

their favor as to all of the Traverses' remaining claims against them, which includes Counts I, II

and III, and VI (Chapter 93A violation), VII (fraudulent transfer), VIII (accounting), IX (RICO)

and X (conspiracy to violate RICO).  D. 386.  The Court heard oral argument on the cross motions

and took these matters (and the related motions to strike) under advisement.  D. 566.

8

## V.      Discussion

Since the parties cross move for summary judgment as to the first three of the Traverses' claims against Defendants, the Court begins with these claims.

### A.      Breach of the LP Agreement (Count I)

To maintain an action for breach of contract, the Traverses must demonstrate "(1) that the parties reached a valid and binding agreement . . . (2) that [Defendants] breached the terms of [that agreement] . . . and [3] that [Plaintiffs] suffered damages from the breach." Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995).  Here, it is undisputed that the Traverses and Defendants have two valid contracts—the LP Agreement, D. 423 ¶ 21; D. 517 ¶ 21, and the JVA, D. 423 ¶¶ 6-7; D. 517 ¶¶ 6-7; D. 405 ¶ 9.[1]  With respect to breach, the Traverses allege that Defendants breached the LP Agreement in several ways: charging Tech Park X greater than reasonable and competitive market rates with respect to management fees; building supervision fees; excessive operating expenses; payments to GCCI for tenant and building improvement projects; and repair costs.  See D. 15 ¶¶ 76-79.

#### 1.      Management Fees

The LP Agreement states that TGC can "employ persons, firms or corporations (including Affiliates) to provide advisory, administrative, professional and other services to the Partnership, and to pay reasonable compensation for such services; but any fee, compensation, reimbursement or other amount paid by the Partnership in connection with such services shall be at reasonable and competitive market rates or at a rate to which the Consent of the Limited Partners has been given." D. 390-1 at 10.  Under the LP Agreement, TGC is entitled to an annual fee of 5 percent

---

[1]To the extent the Traverses reserve any argument as to the validity of the JVA, D. 517 ¶ 16, they fail to point to any evidence in the record that the JVA is invalid.

of the "gross income of the Building." Id. at 19-20.  TGC bases the five percent management fee on the gross income Tech Park X collects from its tenants, which includes base rent, the Operating Expense Escalation, the tenants' electricity reimbursements, and HVAC overtime ("OT") charges. D. 423 ¶ 108; D. 517 ¶ 108.  With respect to this management fee, the Traverses allege Defendants breached the LP Agreement by charging for electricity reimbursements and OT HVAC.  D. 516 at 14.  The Traverses claim that the "gross income" mentioned in the LP Agreement is equal to the "partnership's income," which, according to the Traverses, did not include electricity reimbursements or OT HVAC.  D. 516 at 14.

The relevant provision of the LP Agreement states that "[a]n annual fee of five (5%) percent of the gross income of the Building or portion thereof leased on a gross lease basis and three (3%) of the gross income of the Building or portion thereof leased on a triple net basis will be paid to [TGC] with payments made on a monthly basis."  D. 390-1 at 19-20.  Similarly, the JVA states that TGC is entitled to payment "for the management services equal to five percent (5%) of the gross income . . . of the building(s) calculated and paid on a monthly basis, including in the computation of gross income, without limitation, operating/maintenance payments and real estate tax payments."  D. 388-1 at 18-19.

Whether a contract is ambiguous constitutes a question of law for the court.  LPP Mortg. Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir.2009).  If a contract term is deemed ambiguous, then the Court may consult extrinsic evidence to deduce the term's meaning.  Bank v. International Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998).  Ambiguity only exists, however, "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and the obligations undertaken." Coll, 50 F.3d at 1122 (internal quotation marks and alterations omitted).  The Court does not

discern any inconsistency in LP Agreement's provision.  The LP Agreement is clear that the five percent fee is calculated according to the "gross income of the Building," D. 390-1 at 19, not the gross income of the Partnership.  The contract language in the LP Agreement, supported by the referenced language in the JVA, does not support a reasonable difference of opinion regarding the meaning of "gross income" of the Building.

Furthermore, even if the LP Agreement was ambiguous, the Traverses fail to present extrinsic evidence that calls for a broader reading of the agreement.  Extrinsic evidence "includes proof of negotiations between the parties, their post-contract conduct, and general trade practice." National Tax Inst., Inc. v. Topnotch Stowe Resort & Spa, 388 F.3d 15, 19–20 (1st Cir. 2004).  The Traverses' presentation of Tech Park X's audited financial statements, see D. 518-22, do not indicate that partnership income is the proper measure for the five percent fee, nor do these statements offer any reason to interpret the LP Agreement's "gross income of the Building" differently.

### 2.   *Building Supervision Fees*

As another ground for breach of the LP Agreement, the Traverses allege that TGC overcharged Tech Park X, from at least 2013 to 2016, by paying GCCI "nearly double the cost of the labor incurred" for building supervision.  D. 15 ¶ 29(b).  The Traverses did not repeat this allegation in their motion for summary judgment but asserted a new, related allegation in their opposition motion for summary judgment, alleging that Defendants employed four building supervisors during this two-year period when only two were needed.  D. 516 at 9-10.  "The proper method for raising new allegations is by a motion to amend the complaint, not in response to a motion for summary judgment."  Conrad v. Caliber Home Loans, Inc., 2017 WL 1496922, at *5, n. 2 (D. Mass. 2017).

Turning to the claim in the Traverses' complaint, it is undisputed that payments for building supervision work at the Tech Park X Building solely reflect actual employee costs.  D. 423 ¶ 120; 517 ¶ 120.  Even if the Court did consider the belated allegation the Traverses raise in their opposition, the Traverses offer allegedly contradictory deposition testimonies as their sole evidentiary support.  D. 516 at 9-10.  The Traverses allege that Kevin Rodenberg, a TGC and GCCI officer, attributed the hiring of four building supervisors to TGC's insufficient familiarity with the building, while Tobin Dozois, another TGC officer, attributed the hiring to a change in occupancy levels.  D. 516 at 9.  However, when asked whether he knew why the Building's supervision declined between 2015 and 2016, Dozois testified to both occupancy levels and familiarity.  D. 518-2 at 65:20-66:7.  Such testimony does not show how the management decision amounts to a breach of contract.  See Lease–It v. Massachusetts Port Authority, 33 Mass. App. Ct. 391, 396 (1992) (noting that a material breach occurs when there is a breach "of 'an essential and inducing feature of the contract[ ]'").  The relevant provision of the LP Agreement states that TGC "shall have the exclusive right to manage the business of the Partnership" and no "Limited Partner . . . shall have any authority or right to act for or bind the Partnership or to participate in or have any control over the Partnership business . . ."  D. 390-1 at 11.  Whether Defendants modified the number of building supervisors at Tech Park X for either of the alleged reasons, the Traverses fail to demonstrate how such decision amounts to a breach of the LP Agreement.

### 3.   *Third Party Operating Expenses*

The Traverses allege that certain third-party operating expenses for services at Tech Park X exceeded reasonable and competitive market rates.  D. 516 at 10-11.  Specifically, the Traverses state that their argument is "based on the facts" that "(1) TGC charged operating costs higher than that permitted by the [LP Agreement]," "(2) [Defendants] admitted that they caused Tech Park X

to pay double the fair and reasonable amount of building supervision expenses for the years 2012-2015," and "(3) the total amount of operating expenses incurred by Tech Park X exceeded the reasonable amount of those expenses as estimated or analyzed in Tech Park X's own internal documentation."  D. 517 ¶ 95.  The claimed 'admission' by Defendants refers to the alleged contradictory testimony from Dozois and Rodenberg referenced above.  Turning to the Traverses' other bases, they rely upon a 2014 Appraisal performed by Bank of America, D. 518-32, which shows that comparable buildings to the Tech Park X Building had annual operating expenses between $6.80 and $9.83 per square foot.  Id. at 54.  The Traverses allege that Tech Park X's operating expenses in 2014, calculated to include only "escalatable expenses" were higher; $10.32 per square foot in 2014, $11.17 in 2015, $10.11 in 2016 and $10.10 in 2017.  D. 558 ¶ 302. Defendants state that Tech Park X's aggregated operating expenses at the Building are between $9.28 and $11.17 per square foot for years 2013 through 2017.  Id.

Turning to the LP Agreement, the Agreement, in relevant part, grants TGC the power to employ people or services with the caveat that "any fee, compensation, reimbursement or other amount paid by the Partnership in connection with such services shall be at a reasonable and competitive market rates."  D. 390-1 at 11.  The Appraisal offered by the Traverses to show Defendants breached this provision of the LP Agreement states that Tech Park X's "[t]otal year two expenses" were "in line with the subject's historical and budgeted cost and supported by the individual line item ranges of the comparables."  D. 518-32 at 55.  The Appraisal furthers, "[c]onsidering the provisions of the subject lease and responsibilities accepted by the tenant and landlord, these expenses are considered reasonable."  Id.

The other admissible evidence in the record also reveals that Tech Park X paid reasonable and competitive rates by evaluating those expenses and negotiating with vendors, D. 426 ¶ 25, and

operating expense information from comparable buildings to the Tech Park X Building, which demonstrate that its operating expenses are in line with others, D. 393 ¶¶ 4-7, D. 393-1. The Traverses fail to provide evidence from which a reasonable factfinder could find that these expenses were unreasonable and in breach of the LP Agreement.

### 4.    *Stipulated Sum Contract Prices and Third-Party Subcontractor Payments*

#### a)    Tenant Improvement and Base Building Projects

The Traverses similarly allege that the prices GCCI charged Tech Park X for tenant improvement and base building projects were excessive and unreasonable. D. 15 ¶ 64. As support, the Traverses point to a fixed-price, tenant-improvement contract for Empirix (the "Empirix Contract"). Rodenberg, GCCI's Treasurer at the time of the contract, signed the Empirix Contract on behalf of Tech Park X, and Fainelli, who was Vice President of Operations at TGC, signed on behalf of GCCI. D. 407-31 at 5. The Traverses stress that there are no records explaining how GCCI or TGC determined the price of the Empirix contract. D. 404 at 12. The Traverses also underscore that there were subcontractor bids lower than the amounts charged by GCCI. See D. 407-15 at 118:25-119:25; D. 407-39; D. 407-41; D. 407-43; D. 407-44; D. 407-45.

The crux of the Traverses' allegation as to such agreements is that the relationship between TGC and GCCI, with GCCI as a wholly owned subsidiary of TGC, prevented arms-length negotiations and created a conflict of interest that resulted in Defendants seeking increased contract prices so as to reap profit. D. 516 at 19-21. However, several TGC officers attested that the scope and budgeted costs were determined based on conversations with the tenants and conversations between Fainelli and Gutierrez. D. 426 ¶¶ 9-18; D. 425 ¶¶ 6-8, 21. Moreover, market information about the stipulated sum contract prices on comparable properties reflects reasonableness. D. 391, D. 426 ¶¶ 31-32; D. 393 ¶¶ 5-7; D. 499, D. 532-1 at 16. GCCI has presented evidence that they

applied industry-standard estimating practices to develop market cost estimates based on tenants' construction and occupancy schedules.  See D. 527 ¶¶ 4-10, 17-21; D. 425 ¶¶ 12-21; D. 527-2 (final budget estimate for Empirix); D. 527-3 (plan used to develop budget cost for Insulet stipulated sum contract).  While the Traverses argue Defendants lack any evidentiary support for these alleged negotiations, D. 517 at 65, Defendants provide admissible evidence as to the existence of these discussions.  D. 426 ¶¶ 25, 28-32; D. 425 ¶ 13.  GCCI selected third-party subcontractors on the market in arms-length transactions for both the Tenant Improvement Projects and the Base Building Improvement Projects, utilizing the same procedures for each.  D. 425 ¶¶ 7, 9-10.

Moreover, the relationship between TGC and GCCI does not in itself breach the LP Agreement.  The LP Agreement specifies that "[t]he Partnership shall enter into a fixed price contract excluding change orders with the Contractor [defined as GCCI] for the construction of the [Tech Park X] Building and related improvements on the Property."  D. 390-1 at 19.  The LP Agreement also does not require GCCI to solicit subcontractors through public listings or any other means to determine reasonable and competitive rates.  Id.  The LP Agreement defines "Contractor" as GCCI, id. at 5, and directs Tech Park X to contract with GCCI for "related improvements on the Property."  Id. at 19.  Defendants provide undisputed evidence that these contract prices were fully negotiated, see D. 426 ¶ 25; D. 527 ¶¶ 4-10, 17-21 (describing estimating work for Empirix and Insulet contracts); D. 529 ¶¶ 27-31; D. 527-3 (plan used to develop budget cost for Insulet stipulated sum contract); D. 527 ¶¶ 4-5, and comparable to other properties' tenant improvement costs per square foot.  See D. 391 ¶ 32; D. 393 ¶¶ 5-7; D. 425 ¶ 10.  While the Traverses purport that lower rates were possible for these tenant improvement projects and point to such instances as when GCCI contracted directly with the tenant, such contentions are not evidence that the prices

charged in other instances were "unreasonable."  Furthermore, the Traverses fail to offer evidence from which a reasonable factfinder could conclude that TGC and GCCI's relationship or negotiation procedures, which do not in themselves breach the LP Agreement, led to unreasonable prices.

Similarly, the Traverses allege that Tech Park X was overcharged for base building projects.  Base building projects were construction projects that took place in the Tech Park X Building's common areas, i.e., entryways and the lobby.  D. 423 ¶¶ 33, 35; 517 ¶¶ 33, 35.  The Traverses argue that while Defendants hired unaffiliated subcontractors, these subcontracts were not market-based and were selected from a "small pool of preferred subcontractors."  D. 516 at 15. The Traverses purport that Defendants fail to offer details regarding the bidding process or bids received.  Id.  They also allege that Defendants failed to check the bids or subcontracts against market data.  Id.  Again, the LP Agreement does not delineate such requirements with respect to the bidding or negotiation process,  see generally D. 390-1, so Defendants hiring from a small pool of preferred subcontractors or receiving a 5 percent fee on subcontracts is not evidence of unreasonable or unfair market rates.

### b)     The Insulet and Empirix Contracts

The Traverses allege that the Insulet Contract, D. 407-33, a Stipulated Sum Contract of $4,150,320, was used to overcharge Tech Park X in 2014.  D. 407-15 at 29.  GCCI ultimately charged Tech Park X $4,290,480 for its work on this contract.  Id.; D. 407-40 at 7.  Defendants present a Superseding Insulet Contract, signed by Arthur Gutierrez on behalf of Tech Park X and John Cataldo, then Vice President for GCCI, that increased the original contract price.  D. 425-8 at 4-6.  According to Defendants, GCCI realized in early 2014 that the original Insulet contract did not include demolition work costs and executed the Superseding Insulet Contract to correct this

error.  D. 425 at ¶ 18.  Although the Traverses question whether demolition work was always expensed in this matter, they do not provide any evidence to show that the increased contract amount is in breach of the LP Agreement.

More generally, the Traverses allege that they are entitled to damages for payments received by GCCI under both the Insulet and Empirix contracts for unsupported and "unexplained" charges.  D. 404 at 27.  On this record, a reasonable factfinder could not find for the Traverses.  Unlike "open book" contracts, GCCI was paid the lump sum contract price, rather than for its subcontractor costs.  D. 529 ¶ 13.  If GCCI's actual costs exceeded the lump sum contract price, GCCI bore the costs, whereas if the actual costs were less than the contract price, GCCI retained those savings.  D. 529 ¶¶ 7-8.  If GCCI sought progress payments from Tech Park X up to the amount of the budgeted costs, and as such, did not submit all of its cost documents when actual costs exceeded the budgeted amount.  D. 528 ¶¶ 19-21; D. 528-4; D. 529 ¶¶ 29-31, 36.  GCCI's actual costs on the Empirix and Insulet contracts were approximately $340,000 and $390,000 below the contract price.  D. 529 ¶¶ 31, 36.  Moreover, the Traverses' own litigation expert, Daniel Andrea ("Andrea"), who calculated the cost per RSF for Insulet, Empirix and other contracts (i.e., Lockheed contract), and found that "tenant improvements in the Boston area appear[ed] to be running" at comparable rates.  D. 532-1 at 17.  The report concluded that the costs for Insulet, Empirix, and Lockheed, per RSF, "appear[ed] to be consistent with the market."  Id.

c)   Unauthorized Work at Tech Park X

The Traverses also allege that Tech Park X paid GCCI unsupported payments under the Insulet and Empirix stipulated sum contract, which the Traverses refer to as "unexplained charges."  D. 404 at 23.  They allege that GCCI performed work for the Empirix tenant

improvements that were not authorized. D. 404 at 23.  These allegations are raised for the first time in the Traverses' motion for summary judgment.  See D. 15.

Even if this claim was properly alleged in the amended complaint, however, a reasonable factfinder could not find these were charges for unauthorized work.  Defendants provide subcontract agreements as evidence that their work was authorized.  See D. 529-8 (Subcontract Agreement with Lake Industries, Inc.); D. 529-8 (Subcontract Agreement with New England Mechanical Associates); D. 529-10 (Subcontract Agreement with Farfaras & Sons Plumbing & Heating Co.), and authorized electrical work, D. 529-11 (Subcontract with Electrical Dynamics, Inc.).  The same is true as to the HVAC, plumbing and electrical work.  D. 529 at ¶¶ 23-28, 41-49; D. 528-5 (Empirix Lease); D. 528-6 (Empirix Contract); D. 529-2 (email to Keith Kalvin with Design/Build HVAC proposal for Empirix); D. 529-8 (Subcontract with Lake Industries, Inc.); D. 529-9 at 2 (Subcontract Change Order requesting HVAC work); D. 529-10 (Subcontract Agreement with Farfaras & Sons Plumbing & Heating Co.); D. 529-11 (Subcontract with Electrical Dynamics, Inc.).

### 5.   *Water Main Repairs*

The Traverses allege Defendants "caus[ed] Tech Park X to incur costs for repairing a water main break caused by GCCI's negligence."  D. 15 ¶¶ 27, 46.  The Traverses present a Water Main Report by Simpson Gumpertz & Heger ("SGH") to support their claim.  D. 423 ¶¶ 178-181.  In the report, SGH concludes that the pipe's corrosion "might" have been "due to damage during original construction or during installation of the tapping sleeve."  D. 398 at 27 § 8.1.  It remains undisputed, however, that Peter Nardini ("Nardini"), a signatory to the Water Main Report, who testified that SGH never determined the actual cause of the water main break or whether the break was the result of an installation error.  D. 396 ¶¶ 9-11.  The Traverses present no other evidence

that Defendants are responsible for the water main break.  Moreover, the Traverses present no evidence that such error was caused by negligence during the installation or would otherwise amount to a breach of the LP Agreement.

For the reasons stated above, the Court allows Defendants' motion for summary judgment as to the breach of contract claim (Count I).

**B.    Breach of Fiduciary Duty (Count II) and Aiding and Abetting Breach of Fiduciary Duty (Count III)**

The Traverses assert breach of fiduciary duty claims against TGC, Arthur and Arturo, alleging that TGC failed to conduct business in the best interest of all partners and engaged in self-dealing.  D. 15 ¶¶ 76-86.  To state a claim for breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages."  Baker v. Wilmer Cutler Pickering Hale & Door LLP, 91 Mass. App. Ct. 835, 842 (2017).

*1.    Statute of Limitations*

a)    No Tolling for Fraudulent Concealment

The Traverses allege that TGC breached its fiduciary duties to the Traverses and Tech Park X by overpaying its own affiliates, diverting Tech Park X funds and other alleged acts.  D. 15 ¶¶ 80-86.  A claim for breach of fiduciary duty is governed by a three-year statute of limitations unless an exception applies.  Micromuse, Inc. v. Micromuse, PLC, 304 F. Supp. 2d 202, 214 (D. Mass. 2004).  The fraudulent concealment statute may toll the statute of limitations "if the wrongdoer either concealed the existence of a cause of action through some affirmative act done with intent to deceive or breached a fiduciary duty of full disclosure."  Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 239 (1st Cir. 2005).  The statute of limitations is not tolled if a plaintiff had "actual knowledge of the facts giving rise to [the] cause

of action." Id.  The actual knowledge standard applies to a plaintiff "who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under Mass. Gen. L.  c. 260, § 12." Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 520 (1997).  "Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary."  Id.  The Traverses allege that they did not have actual knowledge of the facts on which their causes of action are based until 2016, when the Traverses hired an accountant to review materials obtained from Tech Park X, D. 405 ¶¶ 90-91, and argue that the statute of limitations was thus tolled for those causes of action that occurred more than three years prior to the commencement of this action.

The Traverses fail to indicate, however, what knowledge they gained in 2016 that they did not already possess or what information Defendants failed to disclose.  It is undisputed that the Traverses inspected Tech Park X's records approximately once every three to five years since the LP Agreement's execution in 1997 and in 2015, 2016, and 2017, respectively.  D. 423 ¶¶ 147-48; 517 ¶¶ 147-48.  The Traverses do not point to any information gained in the 2016 audit that was not known or disclosed in previous years.  The Traverses claim they hired an accountant in 2016 "to figure out why the partnership had not made distributions to the limited partners," D. 516 at 22, but the Traverses hired an accountant several times prior to 2016 to review Tech Park X's records, D. 517 ¶ 147, and had not received distributions since 2010.  D. 519 ¶ 36.  The Traverses main allegation as to Defendants' alleged breach of fiduciary duty is that Defendants engaged in self-dealing by being on "both sides" of the Insulet and Empirix contracts, with signatories holding simultaneous positions at TGC and GCCI.  D. 404 at 28.  The Traverses allege that Defendants utilized the relationship between TGC and GCCI to overcharge Tech Park X and gain personal benefit.  See, e.g., D. 15 ¶¶ 88-89, 96.  However, the Traverses knew GCCI was Tech Park X's

general contractor and a wholly owned subsidiary of TGC prior to 2016.  D. 565 ¶ 224.  The LP Agreement defines Tech Park X's "Contractor" as GCCI, D. 390-1 at 5, 19, thereby designating GCCI as its general contractor to be used for all construction at the Property.  Id.

The Traverses fail to identify any bases for their breach of fiduciary duty claims that were only discovered at or after the 2016 audit.  Accordingly, the Traverses' fiduciary duty claims against TGC, Arturo and Arthur pre-dating December 29, 2014 (three years prior to the filing of this case) are time barred.

b)   <u>No Tolling Under the Adverse Domination Doctrine</u>

The Traverses' derivative breach of fiduciary duty claims against TGC, Arturo and Arthur are also not tolled under the "adverse domination" doctrine.  Under this doctrine, the statute of limitations is tolled "for any period during which a corporate plaintiff was under the adverse domination and control of wrongdoers."  <u>Sousa v. BP Oil, Inc.</u>, No. 83-4046-DPW, 1995 WL 842003, at *9 (D. Mass. Sept. 12, 1995), <u>aff'd in part</u>, <u>dismissed in part</u>, 98 F.3d 1357 (Fed. Cir. 1996).  The doctrine's purpose is to account for the unfairness that results "if a plaintiff—in these circumstances the corporation—is unable to file suit against the alleged wrongdoers because those wrongdoers refuse to allow the corporation to act in its own interest."  <u>Aiello v. Aiello</u>, 447 Mass. 388, 402 (2006).  The doctrine is also intended to protect a corporation "where the agents of a corporation who know of the injury are themselves the wrongdoers," so as not to "impute the agents' knowledge to the corporation—thus leaving the wrong undiscovered by the potential plaintiff."  <u>Id.</u>

Under one version of the adverse domination doctrine, the statute does not run until "a majority of board members are disinterested and the board is therefore able to act on behalf of the corporation against the wrongdoer."  <u>Id.</u> at 400.  In the stricter version, a party seeking to invoke

the doctrine has the heavier burden of showing a "full, complete and exclusive control in the directors or officers charged." Sousa, 1995 WL 842003, at *9 (quoting International Rys. of Centr. Amer. v. United Fruit Co., 373 F.2d 408, 414 (2d Cir. 1967). Moreover, "once the facts giving rise to possible liability are known, the [representative] plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." Id. The existence of culpable directors alone does not lead to a presumption that a corporate plaintiff is thus "unable to discover or redress wrongs perpetuated by such directors, thereby tolling [the] statute of limitations . . ." Aiello, 447 Mass. at 403. Where a shareholder does not need the permission of a board to bring a derivative suit, the relevant inquiry becomes "whether the informed director or shareholder…can induce herself (as a representative of the corporation) to sue," id. at 405-06, and be so motivated. See, e.g., Clark v. Milam, 192 W.Va. 398, 404 (1994) (noting that the adverse domination doctrine "tolls the statute of limitations so long as there is no one who knows of and is able and willing to redress the misconduct of those who are committing the torts against the corporate plaintiff").

The Traverses argue that Tech Park X was under the adverse domination of TGC, and therefore, the statute of limitations should be tolled under this doctrine. D. 516 at 23. Tech Park X is not, however, and was never, in "full, complete and exclusive control" of TGC. Sousa, 1995 WL 842003, at *9. TGC is the sole general partner of Tech Park X and holds a 1.775 percent partnership interest in Tech Park X. D. 405 ¶ 2. It is undisputed that Arturo and Arthur hold approximately 32.21625 percent limited partnership interest in Tech Park X and that the Traverses jointly hold a 38 percent limited partnership interest, with the remaining interests held by various others. D. 423 ¶ 19; D. 405 ¶ 4. As evidenced by the Traverses' inspections, Tech Park X did not maintain such control over TGC that the Traverses were unable to obtain the knowledge

necessary to file suit.  Accordingly, the Traverses have not met their burden of showing that TGC completely dominated the partnership in the manner necessary to toll the statute of limitation under this doctrine.

### 2.       *Derivative and Direct Claims*

Whether a claim may be pursued derivatively depends on "whether the harm [plaintiffs] claim to have suffered resulted from a breach of duty owed directly to them, or whether the harm claimed was derivative of a breach of duty owed to the corporation."  Int'l Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 476 Mass. 553, 558 (2017).  To determine whether a claim belongs to the corporation, a court "must inquire whether the shareholder's injury is distinct from the injury suffered generally by the shareholders as owners of corporate stock."  Stegall v. Ladner, 394 F. Supp. 2d 358, 364 (D. Mass. 2005) (internal quotations omitted).

Here, the alleged injury is not distinct, and therefore, cannot be brought in its direct form. The Traverses' allegations relate to a diminution in Tech Park X's total assets, which only derivatively harmed the Traverses.  See, e.g., Blasberg v. Oxbow Power Corp., 934 F. Supp. 21, 26 (D. Mass. 1996) (noting that "[i]f a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor"). For the Traverses' claim to be direct, it would need to flow from a breach of duty "owed directly to [the Traverses] independent of the [Traverses'] status as a shareholder, investor, or creditor of the corporation."  Branch v. Ernst & Young U.S., No. 93-10024-RGS, 1995 WL 791941, at *4 (D. Mass. Dec. 22, 1995). The injury posited by the Traverses stems plainly from the Traverses' status as shareholders in Tech Park X and the alleged injuries committed against Tech Park X. Accordingly, the Traverses' claims against TGC, Arthur and Arturo are derivative claims only.

### 3.      *Breach of Fiduciary Duty by TGC*

Turning to the Traverses' derivative claims against TGC, to state a claim for breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages." Baker, 91 Mass. App. Ct. at 842. As to the first element, general partners owe other general partners "a strict fiduciary duty [that] restricts the actions of partners so that they may not 'act out of avarice, expediency or self-interest in abrogation of their duty of loyalty to the other [partners].'" JRY Corp. v. LeRoux, 18 Mass. App. Ct. 153, 166 (1984). They owe each other "a duty of utmost good faith and loyalty." Id. It is a long-standing rule, however, that "[w]hen a director's contested action falls entirely within the scope of a contract between the director and the shareholders, it is not subject to question under fiduciary duty principles." Fronk v. Fowler, 456 Mass. 317, 331 (2010) (internal quotation marks omitted). Where the partnership agreement "expressly address[es] the [alleged] action, 'the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that otherwise govern.'" Fronk v. Fowler, 71 Mass. App. Ct. 502, 507 (2008).

Similar to their claim for breach of contract, the Traverses allege that TGC (1) failed to conduct business with affiliates on an arms-length basis, (2) overpaid its affiliates, and (3) caused Tech Park X to overpay its affiliates, incur unnecessary expenses, divert Tech Park X funds to TGC and its affiliates, forge contracts with third parties that required the partnership to pay amounts above market rates, and bear the cost of repairing a water line rupture for which GCCI was allegedly at fault.[2]  D. 15 ¶ 82. The Traverses claims regarding TGC's use of GCCI as its

---

[2]  Given the statute of limitations, all claims addressed here are limited to actions that took place on or after December 29, 2014. As such, claims specific to the alleged water main break, caused

contractor for Tech Park X projects is within the scope of the LP Agreement. The LP Agreement grants TGC the "exclusive right to manage the business of the Partnership," and entitles TGC to employ "persons, firms or corporations (including Affiliates)" to provide services to the Partnership. D. 390-1 at 10-11. The LP Agreement also states that "[t]he Partnership shall enter into a fixed price contract excluding change orders) with the Contractor [defined as GCCI] for the construction of the Building and related improvement on the Property . . ." D. 390-1 at 19. It additionally grants GCCI a fee for construction work, id., and grants TGC a fee for management services. Id. at 18-19. Given the encompassing nature of the LP Agreement, TGC's obligations to Tech Park X "are determined by reference to contract law" rather than fiduciary principles. Fronk, 71 Mass. App. Ct. at 507.

Accordingly, the Traverses cannot contest Defendants' use of GCCI for Tech Park X construction projects when such action falls squarely within the LP Agreement's defined terms and Defendants owed them no greater obligation. See Selmark Associates, Inc. v. Ehrlich, 467 Mass. 525, 537 (2014) (noting that when challenged conduct "is clearly contemplated by the terms of the parties' written agreements, [courts] have declined to find liability for breach of fiduciary duty"). The Traverses' breach of fiduciary duty claim fails for the same reasons explained above as to the breach of contract claim. See Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007) (dismissing breach of fiduciary duty claim where alleged conduct "falls squarely within the contract" that outlines obligations owed).

As to the final element, a plaintiff must prove causation to recover damages for breach of fiduciary duty. MAZ Partners LP v. Shear, 265 F. Supp. 3d 109, 116 (D. Mass. 2017), aff'd sub

---

by the installation of a tapping sleeve around 1999 or 2000, D. 517 ¶ 173, and any alleged overcharges incurred prior to December 29, 2014, are time-barred.

nom. In re PHC, Inc. S'holder Litig., 894 F.3d 419 (1st Cir. 2018). The Traverses claim TGC's breach of fiduciary duty caused Tech Park X to pay "charges of at least $1.39 million over competitive market rates." D. 404 at 30. The Traverses' support for such damages is the opinion of Agim Demiraj. In Demiraj's original report, Demiraj opined that Tech Park X incurred $1,643,998 in excess charges between 2012-2017, D. 329 at 4, and in a corrected report, he opined Tech Park X incurred $1,898,053.92 in excess charges for the same years. D. 329-1 at 3.[3] Demiraj, however testified that he could not offer an opinion as to whether his "takeoffs accurately summarize all the work that was actually performed on all of the ten projects," but rather, was offering his "interpretation of the information" in the drawings and schedules. D. 558-6 at 5-6; 13. Defendants note that Demiraj's estimates of the work that he believes should have been performed are actually greater than GCCI's actual costs. D. 443-3 at 142-194. Without more, the Traverses cannot prove injury as a matter of undisputed fact. Accordingly, the Court denies the Traverses' motion for summary judgment on Count II for breach of fiduciary duty against TGC and allows Defendants' motion for summary judgment as to this count.

### *4.    Breach of Fiduciary Duty by Arturo Gutierrez and Arthur Gutierrez, Jr.*

The Traverses also claim that Arthur and Arturo, as leaders at TGC and GCCI, are liable for TGC's breach of fiduciary duty. D. 15 ¶ 85-56; D. 404 at 30. Arthur served as President of TGC.

Corporate officers are liable for torts (including breach of fiduciary duty, Ray-Tek Services, Inc. v. Parker, 64 Mass. App. Ct. 165, 178 (2005)) in which they "personally participated whether or not [they] were acting within the scope of [their] authority." La Clair v. Silberline Mfg. Co., 379 Mass. 21, 29 (1979). They are "held to a good faith and inherent fairness standard of

---

[3] Agim Demiraj's Third Expert Report is stricken from the record, see discussion below.

conduct and are not 'permitted to serve two masters whose interests are antagonistic.'" <u>Donahue</u> <u>v. Rodd Electrotype Co. of New England</u>, 367 Mass. 578, 594 (1975) (internal citation and quotation marks omitted).  The Traverses allege that Arthur, as President of TGC and GCCI, "actively participated in" TGC's breach of fiduciary duty by playing a part in TGC's alleged decision to deliver "no-bid, off-market, fixed-fee contracts" to GCCI.  D. 404 at 30.  However, as discussed, the LP Agreement defines the Partnership's contractor as GCCI.  D. 390-1 at 19.  As discussed above as to the breach of contract claim, the LP Agreement does not delineate a required bidding process and Defendants provide undisputed evidence that they did look to the market when determining rates.  <u>See</u>, <u>e.g.</u>, D. 426 ¶ 25, D. 527 ¶¶ 4-10, 17-21; D. 425 ¶¶ 12-21.   Moreover, the Traverses do not present evidence, outside Arthur or Arturo's title, that either personally participated in the decisions comprising the alleged breach.

Accordingly, the Court allows Defendants' motion for summary judgment as to Count II for breach of fiduciary against Arturo and Arthur and denies the Traverses' motion for summary judgment in this regard.

### 5.    *Aiding and Abetting Breach of Fiduciary Duty*

The Traverses also allege that Arthur and Arturo aided and abetted TGC's breach of fiduciary duty by misappropriating Tech Park X funds.  Aiding and abetting a breach of fiduciary duty "requires proof that:  (1) there was a breach of fiduciary duty; (2) the defendant knew of the breach; and (3) the defendant actively participated or substantially assisted in or encouraged the breach to the degree that he or she could not reasonably be held to have acted in good faith."  <u>Prof'l</u> <u>Servs. Grp., Inc. v. Town of Rockland</u>, 515 F. Supp. 2d 179, 192 (D. Mass. 2007).  The Court does not find a breach of fiduciary duty as to the alleged overcharges and other unlawful acts alleged by the Traverses in this claim.  Accordingly, the Traverses cannot satisfy the first element of their

aiding and abetting claim as to those allegations.  However, the Court now turns to the Traverses'

breach of fiduciary duty claim pertaining to the alleged $2.3 million "phantom loan."  D. 15 ¶ 68,

136.

The Traverses allege that Arthur and Arturo had TGC execute a $2.3 million promissory

note from Tech Park X to Arturo for funds Tech Park X never received.  D. 15 ¶ 47.  At the time

of the loan, Arturo was serving as TGC and GCCI's Chairman.  D. 423 ¶ 3; 517 ¶ 3.  The Traverses

allege that Arturo aided and abetted TGC's breach of fiduciary duty by standing on both sides of

the  promissory note—paying money to TGC and GCCI—while making said payments with Tech

Park X funds.  D. 516 at 27.  Defendants argue that Tech Park X had insufficient funds to pay

down a $2.3 million liability and that TGC asked Arturo to make a non-interest-bearing loan to

Tech Park X in this amount because GCCI had already paid its subcontractors for the work.  D.

423 ¶ 136-138; D. 517 ¶ 139.  The Traverses do not dispute that Tech Park X reported a debt of

approximately $2.4 million due to TGC and GCCI at the time the loan was made, D. 517 ¶ 136,

nor do the Traverses dispute that Tech Park X did not have the funds to repay these accounts.  Id.

¶ 137.  While the Traverses allege this could have been solved by having Arturo make capital

contributions to TGC or GCCI, D. 516 at 21-22; D. 517 ¶ 139, this is not sufficient to show that

the loan was itself a breach of TGC's fiduciary duty or that Arturo assisted such a breach by

engaging in the transaction.  An accountant hired by the Traverses, Andrea, concluded, following

a review that included the promissory note, that while "unusual," "it appears all terms of this note

payable are in accordance with the partnership agreement."  D. 532-1 at 22.  A second accountant,

Matthew Stohlman ("Stohlman"), performed a review of Tech Park X's records in 2016.  D. 423

¶ 115; 517 ¶ 115.  Ilira Demiraj ("Ms. Demiraj"), the Traverses' bookkeeper, at the time of this

review, understood that the $2.3 million check funded Tech Park X's $2.3 million shortfall.  D.

510-6 at 3-8, 14-15.  Without more, there is inadequate evidence for a reasonable juror to find the promissory note to be a breach of fiduciary duty and the Traverses present no additional evidence as to how Arturo aided and abetted TGC's alleged breach.

Turning to Arthur, no evidence was presented as to how Arthur aided and abetted TGC's alleged breach of fiduciary duty outside his role as TGC and GCCI President and his role in the promissory note transaction.  The Traverses argue that Arthur was "at the center of the scheme" but their evidence solely points to Arthur's general position at both companies, D. 517 ¶ 206, 218, and his participation in contract negotiations.  D. 517 ¶ 243.  As noted above, the Traverses' breach of fiduciary duty claim against TGC does not survive summary judgment.  Even if the Court found TGC's actions to constitute a breach of fiduciary duty, however, Arthur's position alone is not sufficient to show that he "actively participated or substantially assisted in or encouraged the breach to the degree that he or she could not reasonably be held to have acted in good faith" or caused any harm.  Prof'l Servs. Grp., Inc., 515 F. Supp. 2d at 192.

Accordingly, the Court allows motion for summary judgment to Defendants on the breach of fiduciary duty claims (Counts II and II) and denies the Traverses' summary judgment motion as to these counts.

### C.   Violation of Chapter 93A (Count VI)

As to the remaining of the Traverses' claims, only Defendants have moved for summary judgment.

The Traverses allege that GCCI violated Chapter 93A, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. c. 93A § 2.  They argue that GCCI aided and abetted TGC to divert Tech Park X assets to GCCI, and by doing so, committed "unfair and deceptive" acts that violated the statute.

D. 15 ¶¶ 108-10.  To sustain a 93A claim under § 11, a plaintiff must "establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by G.L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice."  Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 820 (2014).

Here, the Traverses rely on the same factual allegations as their breach of fiduciary duty and aiding and abetting claim, contending that Arthur, Arturo, and GCCI aided and abetted TGC in breaching its fiduciary duty by diverting Tech Park X funds to GCCI and its affiliates.  D. 15 ¶ 109.  As explained above, the Traverses failed to provide sufficient evidentiary support to survive Defendants' motion for summary judgment as to their breach of fiduciary duty and aiding and abetting claims.  Accordingly, the Court grants summary judgment to Defendants on Count VI.

### D.    Fraudulent Transfer in Violation of Chapter 109A (Count VII)

The Traverses allege that Defendants caused Tech Park X to make numerous transfers of funds to GCCI and other affiliated entities that rendered Tech Park X insolvent within the meaning of Chapter 109A.  D. 15 ¶¶ 111-15.  Under § 5(a) of Chapter 109A, in relevant part, "[a] transfer made or obligation incurred by a debtor is [constructively] fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  Mass. Gen. L. c. 109A, § 5(a).  Section 5(a)(2) "applies when the debtor has an unreasonably small amount of remaining assets or an intent or reasonable belief that 'the

transfer would render [him] insolvent.'" <u>Brennan v. Ferreira</u>, No. 16-cv-12536-WGY, 2017 WL 1754762, at *3 (D. Mass. May 2, 2017).   To prevail on a Mass. Gen. L. c. 109A claim, the Traverses must "demonstrate (1) that [they are] creditor[s] and (2) that [Defendants] fraudulently transferred [ ] property." <u>Alford v. Thibault</u>, 83 Mass. App. Ct. 822, 827 (2013).

Mass. Gen. L. c. 109A, § 2 "defines a 'creditor' as 'a person who has a claim.'" <u>Id.</u>  A claim is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." <u>Id.</u> (internal quotation marks omitted).   Defendants argue that the Traverses are owners, not creditors, and that owners have not thus far been considered creditors. Fraudulent conveyance laws, such as state statutes adopting some form of the Uniform Fraudulent Transfer Act ("UFTA"), "are intended to prevent shareholders, *secured creditors*, and others from benefitting at the expense of others, including *unsecured creditors*." <u>Weiler v. PortfolioScope, Inc.</u>, 469 Mass. 75, 91 (2014) (emphasis in original).   Shareholders and creditors are separate figures, with unsecured creditors given increased protection over shareholders. <u>Id.</u> The Traverses are not considered 'creditors' for these purposes.   Accordingly, the Court grants summary judgment to Defendants on Count VII.

### E.   <u>Accounting (Count VIII)</u>

The Traverses allege that they are entitled to "a full accounting" from TGC of Tech Park X's affairs, as well as restitution and disgorgement for any sum or balance found to be due to Tech Park X following the accounting.  D. 15 ¶¶ 119-120; D. 516 at 29-30.  The existence of a fiduciary relationship is "a prerequisite for an equitable accounting claim under Massachusetts law." <u>In re McCabe</u>, 345 B.R. 1, 10 (D. Mass. 2006); <u>see</u> <u>Chedd-Angier Prod. Co. v. Omni Publications Int'l, Ltd.</u>, 756 F.2d 930, 937 (1st Cir. 1985).  The Traverses must also establish that there is no adequate

remedy at law, <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469, 478 (1962), and that a demand for an accounting has been made. <u>Beram v. Ceaco, Inc.</u>, 219 F. Supp. 3d 274, 282 (D. Mass. 2016). "[I]n order to maintain such a suit on a cause of action cognizable at law . . . the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." <u>Dairy Queen, Inc.</u>, 369 U.S. at 478.

Here, as established above, TGC and Tech Park X's relationship is governed by the LP Agreement rather than fiduciary obligations. <u>Fowler</u>, 71 Mass. App. Ct. at 507. Even if a fiduciary obligation existed between the parties beyond the obligations provided for in the LP Agreement, however, Defendants dispute the notion that the Traverses are entitled to an equitable accounting given the adequacy of available legal remedies, which they identify as the "Books and Records" clause of the LP Agreement. D. 399 at 30. The LP Agreement, Article IX, prescribes the scope of the Traverses right to examine Tech Park X's books and records. D. 423 ¶ 146; D. 517 ¶ 146.

> Section 9.1. Books and Records. The books and records of the Partnership shall be kept and maintained at the principal office of the Partnership and shall be available for examination by any Partner, or his duly authorized representatives, during regular business hours. The Partnership may maintain books and records and may provide such financial, or other, statements as the General Partner in their sole discretion deem advisable.

<u>Id.</u> It is undisputed that the Traverses exercised that right in 2015, 2016, and 2017. D. 423 ¶ 147. It is also undisputed that these reviews were sufficient for the Traverses to reconcile all of Tech Park X's the financial accounts. D. 423 ¶ 153; <u>see</u> <u>Barron Chevrolet, Inc. v. Barron</u>, 92 Mass. App. Ct. 1128, 2018 WL 988389, at *2 (2018) (denying equitable accounting claim because the plaintiff had already received the accounting sought and defendant had already accounted for handling of funds). The Traverses argue that the contractual inspection right is limited, as exemplified by Defendants preventing the Traverses from obtaining "the kinds of documents that would be reviewed in an accounting." D. 516 at 29-30. To support their argument, the Traverses

cite to D. 24 in a related action, Traverse v. Gutierrez Co., No. 18-cv-10723-DJC, in which the Traverses sought a preliminary injunction to enjoin TGC from failing to make documents related to partner loans, partnership activities, financial reporting mortgage debts and cash disbursements for the Tech Park X Partnerships from 2018 to present, and other related documents available.  The Court denied the Traverses' claim for relief, however, explaining that "even assuming TGC had refused to make books and records related to the proposed sales available for inspection, the Traverses have not specifically identified any documents that have not yet been disclosed that would be 'material'" to their claim.  Id.  Such conclusion as a matter of failing to show a likelihood of success on the merits does not equate to the Traverses not having an adequate remedy at law under the LP Agreement.  See Adrion v. Knight, No. 07-11277-RGS, 2009 WL 3152885, at *1 n.1 (D. Mass. Sept. 28, 2009) (referring to an equitable claim of unjust enrichment, "the availability of an adequate remedy at law (whether successful or not) precludes" such claim).   Accordingly, the Court grants summary judgment to Defendants on the Traverses' accounting claim Count VIII.

### F.   Violation of Racketeering Influenced and Corrupt Organizations Act (RICO) (Count IX) and Conspiracy to Violate RICO (Count X)

The Traverses assert a claim against Defendants for purported violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO").  D. 15 ¶¶ 121-139.  RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

#### 1.   Standing under RICO

To have standing under RICO, a plaintiff must show that an injury to its business or property was "caused by the predicate acts [in this case] of wire and mail fraud."   Rectrix

Aerodome Centers, Inc. v. Barnstable Mun. Airport Comm'n, 632 F. Supp. 2d 120, 125 (D. Mass. 2009), aff'd sub nom. Rectrix Aerodrome Centers, Inc. v. Barnstable Mun. Airport Comm'n, 610 F.3d 8 (1st Cir. 2010).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  Id. The Traverses have alleged direct and derivative claims against all Defendants for their RICO claims.  D. 15 at 29.  The Traverses fail, however, to provide evidentiary support for the assertion that Defendants' alleged fraud injured them directly.  According to the Traverses' allegations, TGC and GCCI "operationally function[ed] as a single entity," D. 516 at 3, with TGC "simply giv[ing] all its construction work on Tech Park X to GCCI, without competitive bidding," and awarding subcontracts "to a small group of subcontractors that GCCI works with repeatedly."  Id. While the Traverses are clear as to how such actions allegedly injured Tech Park X, with Tech Park X allegedly being charged unauthorized or unreasonable costs, the Traverses do not present any evidence as to how that they were personally injured by these actions.  The partnership has had insufficient funds to make distributions to the Traverses, or others, since 2012.  D. 423 ¶ 156; 517 ¶ 156.  The Traverses offer no evidence to support the assertion that this halt is the result of inflated costs or some alleged scheme.  GCCI has been TGC's wholly-owned subsidiary since its inception—long before distributions stopped in 2012.  Moreover, in 2009 or 2010, Nortel, a tenant at Tech Park X, filed for bankruptcy.  D. 423 ¶¶ 32, 155; 517 ¶¶ 32, 155.  Nortel's lease was set to expire in July 2012, and its replacement entered into a new lease at Tech Park X for a smaller portion of the space previously occupied.  Id. at ¶ 32.  In 2017, Nortel's replacement filed for bankruptcy and the Building had an occupancy rate of less than 50 percent.  Id. at ¶ 56.  The Traverses do not offer any evidence to support the inference that the halt to distributions was caused by an alleged scheme or enterprise, rather than a series of bankruptcies at the Tech Park X

Building.  Accordingly, no reasonable factfinder could find on this record the causation necessary for standing to make a direct RICO claim.

### 2.      *RICO Claims Against TGC*

To succeed in a civil RICO action, plaintiffs must establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Giuliano v. Fulton, 399 F.3d 381, 386 (1st Cir. 2005).  Plaintiffs must allege each of these elements to state a claim.  "'Racketeering activity' means any act that violates one of the federal laws specified in the RICO statute . . . including the mail and wire fraud statutes."  Id.  To show a "pattern," a plaintiff must allege "two acts of racketeering activity," "within ten years of each other," that are "related" and "amount to or pose a threat of continued criminal activity."  Id.  There are two ways that a plaintiff may show that the criminal activity at issue satisfies the continuity requirement of such showing: the "closed-ended approach," which requires a plaintiff show "a series of related predicates extending over a substantial period of time" that amount to "a threat of continued criminal activity," and the "open-ended approach," which requires a plaintiff to show "a specific threat of repetition extending indefinitely into the future" or as "part of an ongoing entity's regular way of doing business."  Id. To determine whether the allegations are sufficient to state a "pattern," the Court must examine predicates that are specifically alleged.  Conway v. Licata, 62 F. Supp. 3d 169, 173 (D. Mass. 2014).

Turning to the Traverses' derivative RICO claims on behalf of Tech Park X, the Traverses allege Defendants engaged in mail fraud, wire fraud and bank fraud.  D. 15 ¶ 126.  Common to the Traverses' enterprise theories is the allegation that Defendants perpetrated a scheme in which (1) GCCI charged Tech Park X higher prices than what subcontracts were for, keeping the difference for themselves and (2) TGC had two officers-in-common of TGC and GCCI sign a $2.5 million

contract, with TGC acting on behalf of Tech Park X.  D. 516 at 10-11.  The Traverses also allege

a "similar pattern" of behavior occurred on renovation work for one of Tech Park X's tenants and

on renovation work in the Tech Park X Building's common area.  Id.  Although the Traverses

sufficiently identify dates that particular TGC officers sent specific financial documents to the

Traverses, D. 15 ¶ 28, identifying financial statements and cash ledgers for 2013, 2014, 2015 and

2016 as documents sent by wire to the Traverses by Tobin Dozois, acting at the direction of Arthur,

from October 2014 to November 2017, id., the scheme only involved a small number of victims—

the co-owners of Tech Park X who did not have interests in the TGC-affiliated entities that were

the recipients of the unlawful transfers.  D. 15 ¶ 12.  The only entity that was negatively affected

according to the alleged scheme is Tech Park X.  Although a RICO pattern "need not have

countless victims, the finite nature of the racketeering activities alleged here, together with their

occurrence over a relatively modest period of time, cannot…support a jury finding of a RICO

pattern under the 'closed continuity' approach."  Efron v. Embassy Suites (Puerto Rico), Inc., 223

F.3d 12, 19 (1st Cir. 2000).

Even assuming that the Traverses' allegations are sufficient under the "open ended" theory

as they allege "a specific threat of repetition extending indefinitely into the future,"  Giuliano, 399

F.3d at 387, they present inadequate evidence to support the inference that Defendants had any

intent to defraud.  Mail fraud, wire fraud and bank fraud all entail "(1) a scheme to defraud based

on false pretenses" and "(2) the defendant's knowing and willful participation in the scheme with

the intent to defraud."  See United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015).  A scheme to

defraud must "be intended to *deceive* another, by means of false or fraudulent pretenses,

representations, promises, or other deceptive conduct."  McEvoy Travel Bureau, Inc. v. Heritage

Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990) (emphasis in original).

The Traverses point to specific instances where Defendants allegedly committed fraud. First, the Traverses point to draw requests TGC submitted by email to Bank of America, in which TGC represented that the amounts sought for payment were "bona fide construction expenses." D. 517 ¶ 167; D. 518-27 (emails between Edward Scioli and Bank of America).  The Traverses allege that these representations were materially false and that Defendants sought $1,000,528.00 from the bank, when only $994,023 had been charged on the Insulet Contract, D. 517 ¶ 167, and only $480,305 was supported by subcontractor invoices or involved general conditions costs, permitting costs and GCCI's fee.  D. 565 ¶ 282.  According to Defendants, however, these bank draws were progress payment requests pursuant to lump sum contracts, i.e., the Insulet AIA Contract.  D. 565 ¶ 281-282; D. 530 ¶¶ 12-13; D. 528 ¶¶ 20-21; D. 529 ¶¶ 9-13; D. 529-2 at 2-7. Defendants explain that in the progress payment requisitions on the Insulet Contract and others, GCCI did not submit an invoice for the cost of the work performed, but instead received a progress payment pursuant to the contract based on progress towards fulfilling GCCI's contractual obligation.  D. 565 ¶ 281; D. 529 ¶ 13.

 Second, the Traverses allege that in response to an inquiry from Bank of America in response to Draw Request No. 3 for Empirix, TGC falsely represented that "Section 7.6 of the Contract" authorized TGC to charge "Tech Park X over $150,000 for a $35,152 subcontract."  D. 517 ¶ 167; D. 518-28 at 6.  The Traverses correctly assert that the Empirix Contract does not have a "Section 7.6," D. 528-6, but this alone does not indicate an intent to commit fraud, particularly when the explanation provided in the email was otherwise accurate.  D. 518-28 at 6.  In TGC's response to Bank of America, Scioli, a project manager at TGC, writes that "[p]er Section 7.6 of the Contract, 100% of all savings from the Contract sum will remain with the General Contractor." Id.  In his response to the Bank's inquiry, Scioli also explained that the requested payment of

$114,904.71, on top of the $35,152 contract price for acoustical ceiling work, "represents savings due to GCCI from the contract amount budgeted of $150,056.71." D. 518-28 at 6. It is undisputed that GCCI is entitled to retain savings it realizes on actual costs as compared with the fixed price contract amount. D. 565 ¶ 229; D. 529 at ¶¶ 7-8. Accordingly, without more, Scioli's reference to Section 7.6 appears more of a typographical error than it does a material falsehood. See, e.g., Dickey v. Kennedy, 724 F. Supp. 2d 207, 216 (D. Mass. 2010) (concluding that "[n]o reasonable juror could therefore find that the letter contained a material falsehood capable of supporting a mail fraud claim").

Third, the Traverses allege that Defendants emailed them audited financial statements from 2012-2016 in which management fees were calculated on rental income when, in fact, they were being calculated on all cash collections. D. 516 ¶ 165. As explained above, Defendants' calculation based on the "gross income of the Building" was consistent with the LP Agreement. D. 390-1 at 19. The references the Traverses make to "rental income" are from an audited financial statement prepared by an independent accounting firm. D. 518-22; D. 558 ¶ 303. The reference therein relates to "rental income" as set forth in the lease agreements, which includes the same payments as those included in Defendants' calculation of "gross income." See D. 530 at ¶15; see also D. 528-5 at 17 (identifying that "rent" means "Fixed Rent plus additional rent, or any other monies payable under this Lease (including without limitation Section 4.2 hereof and electricity pursuant to Exhibit D, Paragraph IX hereof)"). Defendants additionally point to the Tech Park X audited financials in 2014, which differentiated between "Base Rental Income" in the revenue of the partnership versus "rental income" for the management fee computation. See D. 518-22 at 49, 55.

While the Traverses allege specific instances of fraud with sufficient particularity, they fail to provide evidentiary support to show that the alleged statements were either false or made with an intent to commit fraud.  The Traverses do not dispute that they are able to reconcile all of Tech Park X's accounts, D. 423 ¶ 153; 517 ¶ 153, and their personal bookkeeper, Ms. Demiraj testified that she was able to reconcile Tech Park X's cash registers to Tech Park X's bank statements.  Id. The Traverses, as in their breach of contract and breach of fiduciary duty claims, speak at length regarding the relationship between TGC and GCCI and the process by which deals were allegedly conducted with officers-in-common in their RICO allegations.  D. 15 ¶¶ 121-131; D. 516 at 2-5. However, without more, the alleged RICO violations require impermissible inferences, unsupported by the record.  Dickey, 724 F. Supp. 2d at 216 (D. Mass. 2010) (granting motion for summary judgment where plaintiff "piles inference upon inference" to build his RICO claim). Accordingly, the Court finds that the Traverses failed to provide a sufficient basis from which to extrapolate a violation of RICO for mail, wire or bank fraud and allows Defendants motion for summary judgment.

### 3.    *Conspiracy to Violate RICO*

The bases for the Traverses' conspiracy claim are identical to that for their affirmative claim under § 1962.  Because they cannot make out a substantive RICO claim, Count X based upon an alleged conspiracy to commit the same violations also fails.  See Efron, 223 F.3d at 21.

### G.    **The Court Grants Summary Judgment to the Traverses on Counterclaims**

The Traverses also seek summary judgment as to Defendants' remaining counterclaims.

### 1.    *Abuse of Process (Counterclaim IV)*

To prevail on an abuse of process claim "it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the

legitimate purpose of the particular process employed." <u>Datacomm Interface, Inc. v. Computerworld, Inc.</u>, 396 Mass. 760, 775 (1986); <u>see</u> <u>Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc.</u>, 652 F. Supp. 1501, 1503 (D. Mass. 1987) (noting that "[t]he essence of the tort of abuse of process is use of process . . . [to] extort some collateral advantage not properly involved in the proceeding").  An abuse of process claim requires a showing "'that 'process' was used, for an ulterior or illegitimate purpose, resulting in damage.'"  <u>Psy-Ed Corp. v. Klein</u>, 459 Mass. 697, 713 (2011).

Defendants allege that several of the Traverses' actions during and preceding the litigation evidence an ulterior motive, including: (1) the Traverses "back[ing] away" from their "more salacious allegations," i.e., that Defendants falsified financial statements; (2) the Traverses' claim regarding the $2.3 million note from Tech Park X, which Defendants allege the Traverses knew all along was a bona fide loan; (3) and the Traverses' allegedly extensive pre-litigation requests for information.  D. 525 at 19-20.  Defendants argue that these actions evidence the Traverses' awareness that the Traverses' claims were "groundless."  <u>Id.</u>  Defendants further argue that the Traverses pursued this litigation, despite allegedly knowing their claims were groundless, to pressure Defendants to offer a full buy-out of the Traverses' partnership interests and terminate the Tech Park Joint Venture and limited partnerships.  D. 34 at 47-48.  Defendants propose the Traverses' settlement demand as evidence of the Traverses' ulterior motive.  However, the settlement was offered on November 20, 2018—nearly a year after the Traverses filed their initial complaint in this litigation on December 29, 2017.  D. 526 ¶ 98.  The settlement was proposed pursuant to Local Rule 16.1(c).  <u>Id.</u>  ¶¶ 98-99.

The bulk of Defendants' evidence for abuse of process is rooted in Defendants' allegations that the Traverses claims are knowingly groundless.  Even if true, however, "mere knowledge that

a claim is groundless is not sufficient in and of itself to establish an abuse of process." <u>N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC</u>, 491 F. Supp. 2d 111, 130 (D. Mass. 2007).  There must also be "proof of an ulterior motive.'" <u>Id.</u> (internal citation and quotation marks omitted).  While the Traverses' settlement proposal is admissible, even under Fed. R. Evid. 408(b), as evidence of ulterior purpose, a settlement communication made nearly a year after litigation was initiated and pursuant to Local Rule 16.1, is not sufficient to create a genuine issue of material fact on this issue.  Even viewing the undisputed evidence in the light most favorable to Defendants, there remains inadequate evidence to conclude that the Traverses pursued this litigation to obtain a premature buyout.  Accordingly, this Court allows the Traverses' motion for summary judgment on Counterclaim IV and this count is dismissed.

### 2.    *Declaratory Judgment (Counterclaim I)*

Defendants allege that TGC is entitled to a declaration that the Traverses committed abuse of process.[4]  As discussed above, summary judgment is warranted for the Traverses on the underlying counterclaim for abuse of process, Counterclaim IV and, accordingly, the same outcome is warranted as to this counterclaim seeking declaratory judgment as to the same matter.  Accordingly, this Court allows summary judgment to the Traverses as to on Counterclaim I and this claim is dismissed.

---

[4] This Court granted the Traverses' motion to dismiss Defendants' request for a declaratory judgment with respect to Defendants' claims for breach for contract, breach of the implied covenant of good faith and fair dealing or breach of fiduciary duty.  D. 131 at 10-11.  The only portion of the counterclaim for declaratory judgment that remains concerns the counterclaim for abuse of process.  <u>Id.</u>

### H.    Motions to Strike

#### *1.    Defendants' Motion to Strike Third Expert Report of Agim Demiraj*

The Court ordered the Traverses to disclose their expert reports by January 16, 2020.  D. 251.  On this date, the Traverses disclosed four expert reports, including the expert report of Agim Demiraj ("the Original Demiraj Report").  On February 28, 2020, the Traverses served a corrected expert report of Agim Demiraj ("the Second Demiraj Report").  Whereas, in the first report, Mr. Demiraj calculated that Tech Park X incurred $1,643,998.00 in excess charges in the years 2012-2017, in the second report, Mr. Demiraj calculated that Tech Park X incurred $1,898,053.92.  D. 461 at 2.  The magistrate judge issued an order on May 18, 2020, finding that only a small part of the second Demiraj report was supplemental—specifically a portion that corrected Mr. Demiraj's mistaken application of escalation factors to 2016 hourly crew labor rates.  D. 402 at 12.  The magistrate judge found that the rest of the report relied upon new evidence and expressed new opinions.  Id. at 12-13.  She also found that the Traverses did not provide any justification for the late disclosure, id. at 13-14, but declined to strike it.  Id. at 14.

In the latest report, served on June 1, 2020 ("the Third Demiraj Report"), Mr. Demiraj calculates that Tech Park X incurred $1,735,194.34 in excess charges from 2012-2017.  D. 438 at 3; D. 443 at 4.  The Third Demiraj Report also provides new opinions about the scope of the work Mr. Demiraj believes should have been performed on each Tech Park X Project, D. 438 at 6, and corrects allegedly inconsistent values from his prior report.  Id.

The magistrate judge found that the Third Demiraj Report is not supplemental and is therefore untimely.  D. 461 at 8-9.  She also determined that excluding the Third Demiraj Report was warranted under the circumstances.  Id. at 9.  The Court accepts this recommendation.  An expert report that contains new opinions based on information available prior to the expiration of

the expert report deadline is not considered "supplemental." Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-cv-100-JD, 2010 WL 1427549, at *4 (D.N.H. Apr. 2, 2010) (internal punctuation marks and quotation omitted); see Massachusetts Mutual Life Ins. Co. v. DB Structured Products, Inc., No. 11-30039-MGM, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (if a report submitted after the close of expert discovery "differs substantially from the report, offers a whole new theory, opinion, or methodology, or is outside of the scope of the general scheme of the report, then it is an improper supplementation"). Mr. Demiraj changes the methodology with respect to "General Condition" values and MEP work. D. 443 at 5, 21-23. He additionally opines that there are over $1.1 million in MEP excess costs, Id. at 23, and presents new "take offs" for every project. Id. The Court agrees with the Magistrate Judge that the Traverses' arguments that these additions do not constitute opinions are not persuasive. D. 461 at 8.

The Traverses argue that the Magistrate Judge's recommendation is "too drastic a remedy." D. 482 at 13; Lawes v. CSA Architects & Engineers LLP, 963 F.3d 72 (1st Cir. June 18, 2020). In Lawes, the First Circuit instructs that courts "should consider the totality of events and then choose from the broad universe of available sanctions in an effort to fit the punishment to the severity and circumstances of the violation." Id. (quoting Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003)). There, the First Circuit found the district court erred to impose "one of the harshest sanctions available, precluding the expert's testimony despite Lawes' tremendous need for it." Lawes, 963 F.3d at 92. The First Circuit also viewed "surprise and prejudice" as significant integers for reviewing whether the district court erred. Id. at 95.

Here, unlike in Lawes, there is a "meaningful difference" between Mr. Demiraj's report and his earlier disclosure, with Mr. Demiraj having added 320 pages worth of additional material

to his prior work.  Such is a prime example of prejudice to Defendants after the untimely disclosure of such a materially different report from Traverses' expert.  Accordingly, the Court grants Defendants' motion to strike and the Court did not rely upon the Third Demiraj Report in its resolution of the cross motions for summary judgment.[5]

### 2. *Defendants' Motion to Strike Affidavit of Daniel Andrea*

Defendants requested the Court strike the affidavit of David Andrea.  D. 562.  Defendants argue that given the Traverses' successful motion for a protective order, which removed Defendants' ability to depose Andrea on the issues for which he now offers testimony, that allowing Andrea's testimony would be prejudicial.  Id.

On July 25, 2019, the magistrate judge entered an Order granting the Traverses' motion for protective order with respect to Andrea.  D. 152.  She noted therein that there was "no indication that the Traverses intend to use Andrea's work as evidence at trial," and that "Mr. Andrea's work appears to have been no more than an attempt to assure that the Traverses had a Rule 11 basis for their claims."  D. 152 at 10.  The Traverses never withdrew their objections to taking the deposition of Andrea, never listed Andrea on their Initial Disclosures, and never indicated to Defendants that they planned to call Andrea to testify.  D. 91; D. 91-1.  On July 27, 2020, the Traverses filed an affidavit by Andrea, an accountant at Feeley & Driscoll, PC (the "Andrea Affidavit"), D. 544, which included topics the Traverses barred Defendants from inquiring upon.  The Traverses counter that considering Defendants' own use of Andrea's report in their opposition, Andrea's affidavit was warranted for context.  D. 568 at 7.

---

[5] To the extent that Defendants seek to have this Court reconsider an earlier order, D. 402, and have the Traverses pay for Defendants' work analyzing and preparing a rebuttal to the Original Demiraj Report. D. 433, the Court denies that request.

In determining whether preclusion is warranted, the Court considers a number of factors including: "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects." Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir.2006) (internal citation omitted). Here, while Defendants claim that they have been prejudiced by being unable to depose Andrea, the Court agrees with the Traverses that Defendants "opened the door" to the introduction of additional evidence by offering Andrea's report in their opposition. Nat'l Union Fire Ins. Co. v. West Lake Academy, 548 F.3d 8, 22 (1st Cir. 2008) (holding district court did not err in admitting evidence of settlement amount because by "having introduced evidence regarding the settlement negotiations between National Union and Travelers, and having suggested that those negotiations were fruitless, Doe opened the door to introduction of evidence regarding her ultimate settlement with Travelers"). Accordingly, the Court denies Defendants' motion to strike the Affidavit of David Andrea, D. 562, and considered same in the resolution of the cross motions for summary judgment and denies Defendants' motion for leave to file a reply brief in support of their motion to strike, D. 572, as moot.

### 3. *Defendants' Motion to Strike, In Part, Affidavits in Opposition to Defendants' Motion for Summary Judgment*

Defendants moved to strike, in part, the affidavits in opposition to Defendants' motion to strike, including portions of the Affidavit of Jason Koral (D. 518) (the "Koral Affidavit") and Nassrine Traverse (D. 519) (the "Traverse Affidavit") that Defendants allege are not based on personal knowledge or offer opinion testimony; portions of the Traverse Affidavit, the Affidavit of Ilira Demiraj (D. 502) (the "I. Demiraj Affidavit"), and the Affidavit of Matthew Stohlman (D. 503) (the "Stohlman Affidavit") that Defendants allege contradict these witnesses' prior testimony; and portions of Plaintiff/Counter-defendants' Response and Counterstatement to

Defendants/Counterclaimants Local Rule 56.1 Statement of Material Facts, D. 517, that Defendants allege do not comply with Fed. R. Civ. P. 56 and L.R. 56.1. D. 537. Defendants additionally move to strike the Affidavit of Agim Demiraj (D. 501) (the "Demiraj Affidavit") for the reasons set forth in Defendants' Motion to Strike Third Expert Report of Agim Demiraj (D. 437).

Generally, evidence must be admissible at trial to be considered on summary judgment, although the form of the evidence itself need not always be admissible. Setterlund v. Potter, 597 F. Supp. 2d 167, 170 (D. Mass. 2008). Accordingly, although an affidavit may not be admissible at trial, it "may be offered as evidence in the summary judgment phase if [the affidavits] set forth facts that would be admissible at trial under the Federal Rules of Evidence." Id. Here, Defendants move to strike multiple portions of four affidavits, D. 502, 503, 518 and 519, and a Statement of Material Facts, D. 517. Defendants' Motion to Strike Third Expert Report of Agim Demiraj, D. 437, is addressed above. Turning to the affidavits and statement of facts, the issues presented fall into three main categories: personal knowledge/opinion testimony, allegedly contradictory testimony and failure to comply with Fed. R. Civ. P. 56 and L.R. 56.1. D. 538. As to the first two categories, the Court is not persuaded as to Defendants' motions to strike testimony by Nassrine, portions of the Koral Affidavit or portions of the I. Demiraj Affidavit or ¶ 5 in Stohlman's Affidavit, and declines to strike them and they remained part of the record that the Court considered in resolution of the cross motions for summary judgment.

The Court also declines to strike, as Defendants seek, eighty-three paragraphs of the Traverses' Responses to Defendants' Statement of Material Facts. D. 538 at 12- 18. One of Defendants' predominant arguments therein is that the Traverses' response constitutes a "legal argument." Id. (citing that the referenced paragraph is a "legal argument" in fifty-nine paragraphs).

Although the Court declines to address each of the objections that Defendants raise, the Court disregarded any statements made in the Traverses' declaration that do not conform to the requirements of Fed. R. Civ. P. 56 and will not consider any improper legal argument made in the Traverses' Statement of Facts.  See Reich v. U.S. Dep't of Energy, 811 F. Supp. 2d 542, 544 (D. Mass. 2011).  Accordingly, the motion to strike the referenced eighty-three paragraphs of the Traverses' Response to Defendants' Statement of Material Facts also is denied.

I.      **Motion to Compel**

The Traverses also sought to compel Defendants to produce certain documents.  D. 470. In Magistrate Judge Boal's order denying same, D. 564, Judge Boal concluded that to whatever extent the Traverses are arguing that Defendants' burden and proportionality objections are improper, it is too late.  Id. at 5. Judge Boal also concluded that that the Traverses' argument regarding whether Defendants should have used the standalone search term "Tech Park" in addition to "Tech Park X," "Technology Park X," "600 Tech Park" and "600 Technology Park" was not persuasive.  Judge Boal determined that Defendants' search appears entirely appropriate, even if it resulted in the exclusion of two email chains.  Id. at 6.  Lastly, the Traverses argue that several emails from Defendants that were tardily produced show that not all evidence from 2012, 2014 and 2015 has been produced.  D. 471 at 16-28.  However, for each of the Traverses' claims of missing documents, Defendants have explained that they either already searched for such documents or already produced the relevant communications.  See D. 281-1 ¶¶ 9, 11.  Judge Boal concluded that given Defendants' responses, the Traverses failed to show that Defendants failed to comply with their discovery obligations.  D. 564 at 8.

The Court reviews Magistrate Judge Boal's order under the clearly erroneous standard of review, under which the Court must accept Magistrate Judge Boal's "findings of fact and the

conclusions drawn therefrom unless, after scrutinizing the entire record, [the Court] 'form[s] a strong, unyielding belief that a mistake has been made.'" Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 4 (1st Cir. 1999) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).  Here, Magistrate Judge Boal's order explains in detail the evidence upon which she has based her findings.  See generally, D. 564.  She explains that the Traverses failed to make a persuasive showing that Defendants' searches failed to capture responsive documents.  Id.  The Court does not conclude that Judge Boal applied the wrong legal standard.  The Traverses argue Judge Boal's sole cited support for the assertion that "absent an agreement between the parties or a timely objection, the producing party is in the best position to determine the method by which it will collect responsive documents," D. 564 at 7, is Ford Motor Co. v. Edgewood Properties, Inc., 257 F.R.D. 418, 427 (D.N.J. 2009), D. 569 at 11, but such is not an incorrect statement of law. See Hyles v. New York City, No. 10-cv-3119 (AT)(AJP), 2016 WL 4077114, at *2 (S.D.N.Y. Aug. 1, 2016).  With respect to the Traverses' argument that Judge Boal erred in finding that Defendants' decision to not use standalone search terms was reasonable, D. 569 at 13-16, such conclusion was not in error and the Traverses failed to show that Defendants' search terms failed to identify responsive documents.

With respect to the Traverses' argument that Judge Boal erred in declining to compel production of subcontractor invoices, Judge Boal rejected the Traverses' argument based on her reading of the Traverses' earlier statements.  D. 564 at 5.  The Order concluded that the Traverses' argument that "all they agreed to do was to 'defer the timing of production of subcontractor documents" was inconsistent with the language of the Traverses' earlier email.  Id.  The Court does not conclude Judge Boal erred in rejecting the Traverses' argument as to the subcontractor invoices' production.

Lastly, the Court does not find the Traverses' argument that Judge Boal erred in failing to require Defendants perform additional searches to capture TGC employee internal communications regarding the appraisal process persuasive.  The Traverses point to an email Defendants' produced in which an employee was instructed to find and send five appraisal-related categories of documents.  D. 569 at 18.  The Traverses argue Judge Boal should not have accepted Defendants' representation that they went back and searched for emails relating to these appraisals, because Defendants only disclosed a single term.  Id.  The Traverses, however, fail to provide sufficient evidence for the Court to conclude a mistake was made regarding Judge Boal's determination that Defendants were not required to perform additional searches for communications that may or may not exist.

Accordingly, the Court does not conclude that the magistrate judge committed clear error in her findings and, accordingly, her order stands, and the Traverses' motion for leave to file reply brief, D. 575, is denied as moot.

## VI.     Conclusion

The Court DENIES in part and ALLOWS in part the Traverses' motion for summary judgment, D. 380 (D. 403 in its unredacted form), allowing the motion as to Defendants' counterclaims (Counterclaim I and Counterclaim IV) only, and ALLOWS the Defendants' motion for summary judgment, D. 386.  The Court DENIES Defendants' motions to strike, D. 437, D. 537 and D. 562, and related motions, D. 433, 572, 575.[6]

**So Ordered.**

---

[6] The Court accepts and adopts the Report and Recommendation on the Defendants' Motion to Strike the Third Expert Report of Agim Demiraj, D. 461, and denies the Traverses' objections thereto, D. 482.

<u>/s Denise J. Casper</u>
United States District Judge